J3c6aco1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4             v.                          18 Cr. 80 (PKC)

5  ROBERT ACOSTA and
   JOSE DIAZ,
6
                Defendants.
7
   ------------------------------x

8
                                         March 12, 2019
9                                        9:40 a.m.

10 Before:

11                    HON. P. KEVIN CASTEL,

12                                       District Judge
                                           and a Jury
13
                            APPEARANCES
14
   GEOFFREY S. BERMAN
15      United States Attorney for the
        Southern District of New York
16 BY:  MICHAEL K. KROUSE
        LAURIE A. KORENBAUM
17      NICHOLAS W. CHIUCHIOLO
        Assistant United States Attorneys
18
   GOLDSTEIN & WEINSTEIN
19      Attorneys for Defendant Acosta
   BY:  BARRY A. WEINSTEIN
20           -and-
   KOFFSKY & FELSEN, LLC
21 BY:  BRUCE D. KOFFSKY

22

23

24

25

J3c6aco1

APPEARANCES (Cont'd)


LAW OFFICE OF SUSAN K. MARCUS
     Attorneys for Defendant
BY:   SUSAN K. MARCUS
          -and-
MIEDEL & MYSLIWIEC, LLP
BY:   FLORIAN MIEDEL


Also present:   ARIELLA FETMAN, Paralegal
                DETECTIVE CARLOS VAZQUEZ, NYPD
                KATHERINE QUEZADA, Paralegal

J3c6aco1

1                (In open court; trial resumed)

2                THE COURT:  Good morning, ladies and gentlemen.

3    Please be seated.  The government is present.  Both sets of

4    defense counsel are present and both defendants are present.

5                Let me turn, if I may, let me give Mr. Weinstein an

6    opportunity to settle in.

7                MR. WEINSTEIN:  Thank You, Judge.

8                All set.

9                THE COURT:  The issue was raised quite appropriately

10   by defense counsel that they had learned that the government

11   had issued grand jury subpoenas after the return of the

12   indictments in this case.  I required the government to make an

13   ex parte submission so that I could determine whether the

14   subpoenas are, were being used for an improper purpose to

15   develop trial evidence -- testimony or other forms of the

16   evidence -- after the indictment which would be improper.  The

17   government has responded in a three-page letter dated March 8,

18   2019, ex parte and under seal in which they have explained

19   exactly what the grand jury's ongoing investigation relates to,

20   who it relates to, and why it remains active.  They have laid

21   out for me the identity of individuals who have been served

22   with grand jury subpoenas.  They appear to match up with the

23   stated ongoing investigation by the grand jury; therefore, I

24   find no improper purpose of the grand jury subpoena.

25                There are pending motions to suppress statements made

J3c6aco1

| | |
|---|---|
| 1 | by Defendant Diaz to Detective Vasquez and Ian and statements |
| 2 | made by defendants to Perez and De La Cruz.  Let me begin with |
| 3 | the Confrontation Clause, which provides in all criminal |
| 4 | prosecutions the accused shall enjoy the right to be confronted |
| 5 | with the witnesses against him.  The crux of this right is that |
| 6 | the government cannot introduce at trial statements containing |
| 7 | accusations against a defendant unless the accuser takes the |
| 8 | stand against the defendant and is available for |
| 9 | cross-examination.  Statements that fall within the ambit of |
| 10 | the Confrontation Clause have been admitted only where the |
| 11 | declarant is unavailable and only where the defendant had a |
| 12 | prior opportunity to cross-examine. |
| 13 | Confrontation Clause targets only testimony that |
| 14 | contains accusations against the defendant.  To implicate |
| 15 | defendant's confrontation rights, the statement need not have |
| 16 | accused the defendant explicitly but may contain an accusation |
| 17 | that is only implicit.  Here, I conclude that the statements |
| 18 | made by Diaz about "The Boss" are accusatory on their face and |
| 19 | certainly implicitly accusatory.  So that element is satisfied. |
| 20 | To implicate the Confrontation Clause, the statement |
| 21 | must be used to prove the truth of the matter asserted and the |
| 22 | statement must be testimonial.  Here, the statements that the |
| 23 | government proffers are intended to be used to prove the truth |
| 24 | of the matter asserted not for the fact that they were said but |
| 25 | for their truth.  So that requirement is satisfied. |

J3c6aco1

1          The key question here is whether the statement is

2     testimonial.  Now, testimonial statements are statements that

3     were made under circumstances which would lead an objective

4     witness reasonably to believe that the statement would be

5     available for use at later trial, and that comes right out of a

6     *Crawford*.  So it is leading an objective witness reasonably to

7     believe that the statement would be available for use at later

8     trial.  That's the inquiry that I am required to make with

9     regard to the statements allegedly made by Defendant Diaz to

10    Detective Vasquez and Ian.

11          Now, the Supreme Court has not provided a

12    comprehensive definition of the term "testimonial" explaining

13    that only that it applies at a minimum to prior testimony at a

14    preliminary hearing, before a grand jury, or at a former trial

15    and to police interrogations.  We know that volunteered

16    testimony can be testimony and subject to the requirements of

17    the Confrontation Clause.  Statements made in the absence of

18    interrogation are not necessarily non-testimonial.  In other

19    words, the presence or absence of interrogation is not

20    dispositive on the question of whether it is testimonial.

21    Statements are testimonial when the primary purpose is to

22    establish -- of the interrogation is to establish or prove past

23    events potentially relevant to later prosecution.  The relevant

24    inquiry as I have noted is not subjective but rather looks at

25    the purpose that reasonable participants would have had.  The

J3c6aco1

*Michigan v. Bryant* case from the Supreme Court refers to

reasonable participant and not exclusively the witness.

So the question as also stated by the Supreme Court in

*Ohio v. Clark* is whether in light of the circumstances viewed

objectively the primary purpose of the conversation was to

create an out-of-court substitute for trial testimony.  Now,

one example where it is not testimonial is an ongoing

emergency, but that's not the only circumstance.  A factor to

be considered is the formality or the informality of the

encounter between the victim and police, but formality is not

the sole touchstone of the primary purpose inquiry.  Formality

makes it more likely that it is a testimonial statement and

informality makes it somewhat less likely that it is a

testimonial statement, but it's simply a factor to be

considered.

Here, I am faced with the following:  Mr. Diaz had

been indicted by a grand jury.  He was arrested while being

transported to the FBI's office for processing.  Officers

provided Diaz information about cooperating with the

government.  Upon arriving at the FBI's office, Diaz received a

form explaining his Miranda rights and inquiring whether he

wished to waive those rights.  The signature on the line on the

form where an individual indicates whether he or she knows and

voluntarily waives his or her Miranda rights contains the words

"Decline to waive/sign."  The government has advised the

J3c6aco1

1   defense that a special agent of the FBI recalls, and this was

2   Tomas Wayne, that Diaz may have said, "I think I want to speak

3   with you guys, but I should probably talk to a lawyer first."

4           The defendant was transported to the Southern

5   District's Pretrial Services.  He then asked to use the rest

6   room -- this is again while he was in the Pretrial Services

7   Office -- and Detective Vasquez accompanied him into the rest

8   room.  While both were in the rest room, Vasquez said to Diaz,

9   "You have a family.  You need to think about your family" and

10  Diaz replied, "That guy looks familiar.  Like, from 30 years

11  ago.  But he looks heavier.  I am not going down for anyone.

12  Chucky was my man.  I want to cooperate, but I don't want to be

13  labeled a snitch."

14          Detective Vasquez escorted Diaz to a common area

15  directly outside of the rest room at which point Diaz stated,

16  That was the Boss Man and that effing Chucky, using the actual

17  expletive.  Diaz asked to call his wife and Diaz made the call

18  over a speaker phone in the common area.  Vasquez and other

19  NYPD detective and FBI agent were present.  On the phone Diaz

20  said, Eff it.  I want to cooperate.  Diaz's wife responded,

21  "You need to do the right thing."

22          I conclude that these statements were such that a

23  reasonable participant would not conclude that from an

24  objective standpoint that the statements were being made for

25  use at a later trial.  This was Mr. Diaz in an unguarded manner

J3c6aco1

speaking aloud about his thought processes in deciding whether

he wanted to sit down and cooperate with the government and

whether he wanted to talk to the government and expressed

hesitancy and reluctance to do so.  The location of the

conversations -- their beginning in a men's room and in the

area of Pretrial Services -- the circumstances, the fact of

their informality, the fact had they were volunteered

statements, none of these factors alone are dispositive; but

taking the totality of circumstances into account, I conclude

that an objective participant would not reasonably believe that

the statement would be available for use at a later trial and

therefore on the evidence that I have so far, they are not

excluded.

There remains the statements made to Perez and De La

Cruz and the statements are set forth on page 2 of Document

113, a letter addressed to the Court from the government dated

March 6, 2019.  There is not much of an issue because the law

is now clear.  Although, I must say years ago it was less than

clear to me.  Statements are "clearly non-testimonial" when

made "unwittingly to a government informant" or "from one

prisoner to another."  That is *Davis v. Washington*, 547 U.S.

813 (2006) citing *Bourjaily v. US*, 483 U.S. 171.  Our circuit

has held that a declarant's statement to a confidential

informant whose true status is unknown to the declarant do not

constitute testimony within the meaning of *Crawford*.  So there

J3c6aco1

 1    is no basis under *Crawford* for the exclusion of those

 2    statements and *Crawford* and for that matter *Bruton*, which

 3    preceded Crawford.

 4            There is still the issue with regard to the tattoo

 5    evidence.  The testimony from Perez concerning -- well, I guess

 6    Perez and De La Cruz were both inmates at the MCC with Diaz and

 7    Acosta and the government expects Perez to testify that Diaz

 8    stated in sum and substance that "Acosta had better keep his

 9    mouth shut" and honor the code while patting his "Death Before

10    Dishonor" tattoo.  That testimony itself there is no

11    discernable reason to keep it out and I am not sure that

12    defense is seeking to keep that out.

13            Am I correct about that, Mr. Miedel?

14            MR. MIEDEL:  Well, your Honor, we're seeking to keep

15    out the tattoo evidence; but that statement in and of itself

16    without the other tattoo evidence --

17            THE COURT:  No.  He tapped his arm and said he better

18    honor the code.  Are you seeking to exclude that?

19            MR. MIEDEL:  That statement, no.

20            THE COURT:  That is what I was asking.

21            MR. MIEDEL:  Okay.

22            THE COURT:  So that comes in.

23            There is also testimony from De La Cruz that Diaz told

24    him that Acosta has tattoos, including a tattoo of a cross on

25    the back of his neck.

J3c6aco1

1          Is anybody seeking to exclude that?

2          MR. KOFFSKY:  No, your Honor.

3          THE COURT:  So there is not an issue there.

4          Finally, Diaz told De La Cruz that he knows that

5    Acosta's nickname is Animal.

6          Is there any issue with regard to that?

7          MR. KOFFSKY:  No, your Honor.

8          THE COURT:  So as I understand the issue is that the

9    government wants to offer evidence not from Perez and not from

10   De La Cruz that Acosta has a Death Before Dishonor tattoo.

11         Is that correct?  Let me hear from the government.

12         MR. KROUSE:  Yes, your Honor.  That's correct.

13         THE COURT:  The inference the government seeks to draw

14   from that is it demonstrates nothing on identity but

15   demonstrates that Mr. Acosta subscribed to the code.

16         Is that correct?

17         MR. KROUSE:  Yes, your Honor.  To be clear the

18   government would seek to introduce evidence as to both men's

19   Death Before Dishonor tattoos.  So the fact that Mr. Diaz --

20         THE COURT:  Well, hang on a second.  We have already

21   established that.  Let's move from where we are.

22         MR. KROUSE:  Yes, your Honor.

23         THE COURT:  The testimony concerning the statement I

24   think Perez made, tapping on his own arm Mr. Diaz pointed to

25   his tattoo Death Before Dishonor and said, "He better follow

J3c6aco1

1    the code," that testimony as of now is in.  So we're not

2    talking about that.  We're not talking about both anything.

3    We're talking now about Acosta.  Perez and De La Cruz are not

4    able to testify, do not have knowledge as to whether Acosta had

5    that tattoo.

6              You want to offer evidence from some other source, law

7    enforcement or otherwise, that Mr. Acosta does have that tattoo

8    as some evidence that Mr. Acosta subscribes to a code.

9              MR. KROUSE:  That Mr. Diaz knew that Mr. Acosta had

10   this tattoo so he was accurate in that statement that he should

11   honor the code because he has a similar tattoo is the main

12   reason to introduce it and to also corroborate Mr. Perez's

13   testimony that Mr. Diaz would say that.  So to show that it's

14   not a statement that came from nowhere that was made up from

15   whole cloth because in fact Mr. Acosta does have that tattoo.

16             Just on Diaz, your Honor, I know the statement is in

17   but to just to be completely clear the government wishes to

18   introduce a photograph of Mr. Diaz's tattoo.  So two matching

19   photographs.

20             THE COURT:  I understand.  I assume that is not

21   objectionable, the photograph?

22             MR. MIEDEL:  The photograph of Mr. Diaz's tattoo?

23             THE COURT:  Yes.

24             MR. MIEDEL:  No.

25             THE COURT:  That's what I thought.

J3c6aco1

1          Thank you.  You have answered inquiry.

2          Here, it's as far as I can tell certainly not 404(b)

3    evidence.  To the extent the argument is that it goes to

4    identity, that is weak and it seems to me that the probative

5    value of this testimony is slight.  The fact that after 20

6    years it can be proved that Mr. Acosta has this tattoo may be

7    some evidence that he may have had it at some earlier time, but

8    the probative value of that is very weak and it's substantially

9    outweighed by the danger of unfair prejudice.  So the evidence

10   of the Acosta tattoo is out on the basis tendered by the

11   government.  That is my ruling.

12         As soon as our jurors are ready, we will pick up with

13   the voir dire process.

14         MR. MIEDEL:  Your Honor, I think that the government

15   sought so introduce not just the Death Before Dishonor tattoo

16   but other tattoos of Mr. Acosta including the Animal tattoo and

17   the tattoo on the back.  I think the same argument applied to

18   that.

19         THE COURT:  Well, I don't agree with you.  I believe,

20   and correct me if I am wrong, that the testimony was that

21   Mr. Diaz identified one of the tattoos, not the Death Before

22   Dishonor and not the Animal tattoo to Mr. Perez.

23         Is that accurate?

24         MR. KROUSE:  Yes, your Honor, the cross on the back of

25   his neck.

J3c6aco1

1      MS. MARCUS:  There were two.  The cross and -- I am

2   referring to your January 30th letter.  There is a man

3   handcuffed -- kneeling man handcuffed.

4      MR. KROUSE:  Your Honor, at this time it would just be

5   the cross tattoo.

6      THE COURT:  So with regard to the cross tattoo, that

7   goes to the issue of identity.  It doesn't have any of the

8   condemned factors that I found with the slight probative value

9   outweighed by prejudicial effect.  So that comes in.

10      MR. MIEDEL:  Your Honor, identity only matters if

11   those tattoos existed back in 1997.  Again, there is no

12   evidence of that.  So what is the point of this testimony to

13   show identity that they knew each other at the MCC in 2018.

14      THE COURT:  No.  No.  Mr. Miedel, that assumes that

15   the only possible source of the information was the contact at

16   the MCC.  You are allowed to raise that on cross-examination,

17   but that's not the only inference that can be drawn from it.

18      MR. KROUSE:  Your Honor, as to the Animal tattoo, the

19   government argued that the photograph of the tattoo should come

20   in to corroborate identity because Mr. Diaz stated that he knew

21   Mr. Acosta as Animal.

22      THE COURT:  Yes.  On that I put that in a different

23   category because that again goes to identity.  I have

24   considered the question of prejudicial effect and I would say

25   that in our society "animal" can have a bad connotation or not

J3c6aco1

1    a bad connotation depending on circumstances.  Three come to

2    mind, and I didn't put a lot of thought into this, but one is

3    University of Alabama football coach Bear Bryant, the famous

4    PGA golfer Tiger Woods, and the golfer Jack Nicklaus, who is

5    referred to as I believe the Gentle Bear.  We can probably sit

6    here all day and come up with instances where "animal" can have

7    a good connotation or a bad connotation.  We know there is the

8    rock group The Animals.  I don't think it has some undue

9    prejudicial effect.  Calling somebody an "animal" in an

10   athletic context of a football player or rugby player is often

11   considered a compliment.  So I don't see it being substantially

12   outweighed by the danger of unfair prejudice.

13          If someone wants me to give an instruction or give

14   those examples or the fact that nicknames are common in our

15   world -- I had nicknames in college as I expect people in this

16   room did at prior times in their life -- and they don't contain

17   a lot of meaning.  So if somebody wants an instruction, I will

18   give it.  If you want to making your own arguments on why

19   nicknames don't mean very much in terms of what the nickname

20   is, you are welcome to do that.  Here, it goes to an issue of

21   identity and there it is relevant.

22          Anything else?

23          Mr. Krouse.

24          MR. KROUSE:  Your Honor, just two issues.  First, the

25   court security and the marshals asked me to raise this with the

J3c6aco1

1    Court.  The government counsel didn't see this, but according

2    to the marshals there was extensive communication between a

3    member of the audience and one of the defendants, Mr. Acosta.

4    We believe that individual who was communicating with

5    Mr. Acosta is his ex-wife.  It's not permitted in the Court to

6    have those kinds of communications.  It is not a visiting room.

7    We would just ask that the Court admonish the defendant to

8    cease any communications with any members of the audience

9    during the trial and during this jury selection process.

10          Another issue was raised by the marshals as well that

11   the person Mr. Acosta was communicating with is his ex-wife

12   also had electronic devices in the courtroom and was seen by at

13   least a couple witnesses who reported this to the marshals

14   apparently communicating with Mr. Acosta and then looking like

15   she was sending text messages from both her Apple watch and her

16   phone.  Our understanding is that this individual is a federal

17   employee, Mr. Acosta's ex-wife, who works at 26 Fed.  I am not

18   sure in what capacity but therefore has a federal ID card and

19   that is why she was permitted to bring the electronic devices

20   into the courthouse building; but obviously if she is here as a

21   spectator for the trial, she shouldn't be permitted to have

22   those electronic devices.

23          THE COURT:  Well, I am not aware.  This Court treats

24   the access, including cell phones in this court, very

25   seriously.  I am not aware of any rule that says that employees

J3c6aco1

1       of the federal government may bring cell phones into the

2       courthouse.

3               Now, if the U.S. Marshal Service should communicate

4       with their colleagues, the court securities officers, and

5       remind them of that point.  Certainly we have rules for

6       attorney pass cards.  The fact that you are an attorney doesn't

7       allow to you bring a phone into the courthouse.  You have to

8       have the court approved pass.  That sounds to me like having a

9       cell phone in violation of the rules and it is up to the CSOs

10      and the Marshal Service to enforce that and I will alert the

11      Marshal for this district of that circumstance.

12              What you were told by the deputy marshal was that he

13      observed a cell phone?

14              MR. KROUSE:  That witnesses informed the deputy

15      marshal I believe that a cell phone was being used and an Apple

16      watch, both of which would be items that would not ordinarily

17      be permitted.  The government was surprised that being a

18      federal employee would allow an individual to come into the

19      courthouse with electronic devices.

20              THE COURT:  It doesn't.  They are not.  That's what I

21      am telling you.

22              MR. KROUSE:  Yes, your Honor.  I don't think there is

23      any question that based on what witnesses have seen -- again,

24      the government counsel didn't see any of this, but that this

25      individual did have electronic devices and I don't think that

J3c6aco1

1    would be disputed.

2            THE COURT:  Right.

3            MR. KROUSE:  I don't believe she is going to be

4    permitted to bring those electronic devices in today.  Then

5    there is a separate question of her communicating with the

6    defendant, which is again also in the government's view

7    improper and should not be permitted.

8            THE COURT:  Mr. Acosta and Mr. Diaz, I order that you

9    not communicate with any person who is in the gallery or

10   spectator section of this courtroom for the duration of this

11   trial.  You are absolutely free to communicate any time you

12   want with any member of the defense team but not with persons

13   in the gallery spectator area.

14           Do you understands that, Mr. Diaz

15           DEFENDANT DIAZ:  Yes,sir.

16           THE COURT:  Do you understand that, Mr. Acosta?

17           DEFENDANT ACOSTA:  Yes.

18           MR. WEINSTEIN:  Your Honor --

19           THE COURT:  Start over again.  The court reporter did

20   not hear you.

21           MR. WEINSTEIN:  The marshal informed me yesterday what

22   was just --

23           THE COURT:  No.  You started off, Mr. Weinstein, with

24   a statement about your communication with your client on that

25   subject.  Could you begin at the beginning?

J3c6aco1

1          MR. WEINSTEIN:  I told my client about that.  I

2    learned yesterday from the marshals and he will not make any

3    motions to anybody in the audience.  I told the person with the

4    phone that will stop also.

5          I did mention to the government and the marshals

6    yesterday, and I noticed this myself, as the jury was leaving a

7    Fermina Acevedo rushed the rail and started yelling at my

8    client.  I also informed the marshal and the government that

9    she was yelling and screaming at my client's mother in the

10   lady's room and they said they would make sure -- she is also

11   on the witness list and should not be in the courtroom.

12         THE COURT:  I want to be emphatic here.  My rules are

13   this is an open courtroom and absent some law enforcement over

14   which I have no control, no person is prohibited from being in

15   this courtroom by this Court.  If there is an issue of witness

16   sequestration that arises, I will address that when it arises;

17   but this is a public trial and no member of the public is to be

18   excluded from this courtroom during the trial absent an order

19   from me.

20         MR. WEINSTEIN:  Thank you, your Honor.

21         If there is any other action by that woman, we would

22   ask for sequestration because she is a witness in this case.

23         THE COURT:  You will keep me posted.  Thank you for

24   alerting me.

25         MR. CHIUCHIOLO:  Your Honor, very briefly.  I raised

J3c6aco1

this at side bar yesterday and your Honor had asked me to

reraise it at a later juncture.  With respect to Juror No. 3,

Juror No. 3 is the attorney at Bloomberg, the antitrust

attorney.  He was former counsel at Willkie Farr & Gallagher

while I was an associate.

THE COURT:  When were you at Willkie?

MR. CHIUCHIOLO:  2011 through 2017.

THE COURT:  All right.  You were a litigator

presumably?

MR. CHIUCHIOLO:  Yes, your Honor.

THE COURT:  Did you know this gentleman?

MR. CHIUCHIOLO:  I did some work for him.  Apparently

he wasn't that memorable.  He did not identity or indicate that

he recognized me or knew me, but I wanted the record to be

clear that I do know him and I did work for him.  I have had no

communication with him since I left Willkie and since he left

Willkie.

THE COURT:  I propose to interview him at side bar

with all counsel present as I am also going to do with Juror

No. 57.

MR. MIEDEL:  One initial matter.  You mentioned

witness sequestration.  Witnesses who are expected to testify

at trial are not supposed to be in the courtroom listening to

the testimony that precedes them.  We would ask for that same

rule to apply here.

J3c6aco1

```
1          THE COURT:  Yes.  That's granted.  The exception to
2    that would be the case agent who is working on the case.  With
3    that exception, no government witness who has not yet testified
4    should be in the courtroom or may be in the courtroom during
5    the testimony of another witness.
6          MR. KROUSE:  Yes, your Honor.  There will be two case
7    agents in this case Special Agent Tomas and Detective Vasquez.
8          THE COURT:  All right.  Your representation is that
9    they are assisting in the presentation of the case?
10          MR. KROUSE:  Yes, your Honor.
11          THE COURT:  Thank you.  We're adjourned until I get
12    word from my deputy.  My law clerk will check whether our
13    jurors are ready and I will come back out when I have my jurors
14    in place.
15          Thank you.
16          (Whereupon, jury voir resumed)
17
18
19
20
21
22
23
24
25
```

J3c6aco1

```
 1              (In open court; jury present)
 2              THE COURT:  Is the jury acceptable to the government?
 3              MR. KROUSE:  Yes, your Honor.
 4              THE COURT:  Is the jury acceptable to the defendants?
 5              MR. WEINSTEIN:  Yes, your Honor.
 6              MS. MARCUS:  Yes, your Honor.
 7              THE COURT:  The clerk can administer the oath.
 8              THE DEPUTY CLERK:  Please stand and raise your right
 9      hand.
10              (A jury of 12 and 3 alternates was impanelled and
11      sworn)
12              THE COURT:  Please be seated.  The balance may now
13      return to the jury room with my thanks.
14              Ladies and gentlemen, the deputy will now take you
15      into the jury room.  We'll take a break and then what will
16      happen is I have some preliminary instructions.  There will be
17      opening statements and then the first witness.  So we'll get to
18      work.  And then lunch.
19              Follow Flo to the jury room.
20              THE COURT:  Please stand for the jury.
21              (Jury excused)
22
23
24
25
```

J3c6aco1

```
 1              (In open court; jury not present)
 2              THE COURT:  Who is going to open for the government?
 3              MR. CHIUCHIOLO:  I am going to, your Honor.
 4              THE COURT:  How long do you anticipate?
 5              MR. CHIUCHIOLO:  10 minutes.
 6              THE COURT:  Who is going to open for Acosta?
 7              MR. WEINSTEIN:  I am, your Honor.
 8              THE COURT:  How long do you anticipate?
 9              MR. WEINSTEIN:  Probably 10 minutes.
10              THE COURT:  Who is going to open for Mr. Diaz?
11              MR. MIEDEL:  I am, your Honor.
12              THE COURT:  How long do you anticipate?
13              MR. MIEDEL:  15 minutes.
14              THE COURT:  That's fine.  We're in recess.  We'll pick
15    up in five or 10 minutes with the preliminary instructions.
16              Thank you.
17              (Recess)
18
19
20
21
22
23
24
25
```

J3c6aco1

1          (In open court; jury not present)

2          THE COURT:  Ladies and gentlemen, you may be seated

3    until we get word on our jurors.

4          Please stand for the jury.

5          (In open court; jury present)

6          THE COURT:  As soon as you come in, you, the jurors,

7    may sit down.  We stand for you.

8          JUROR:  I little false modesty never hurt.

9          THE COURT:  Ladies and gentlemen, you may be seated.

10   As you will find, you will get getting in and out of the jury

11   box down to a science, to a waltz.  You will see there is a

12   second entrance on this side if that makes it easier for any of

13   you.

14         Ladies and gentlemen, as you heard during the jury

15   selection process, my job is to instruct you as to the law that

16   governs or controls the case.  I will give you those

17   instructions at the end of the trial.  In fact, I am going to

18   speak them and I will give them to you in writing.  So you will

19   have them at the end of the case and during your deliberations.

20   You will also have a verdict sheet.  There are a few

21   instructions that I wish to give you at the outset of the case.

22         This is a criminal case.  An indictment was filed by a

23   grand jury sitting in this district and an indictment is not

24   evidence.  It is simply the charges that the government is

25   required to prove to the satisfaction of the jury by proof

J3c6aco1

beyond a reasonable doubt.  The indictment contains six counts

or charges.  Count One and Two charge the defendants, Robert

Acosta and Jose Diaz, with participating in the intentional

killings of Alex Ventura and Aneudis Almonte on December 22nd,

1997, while engaged in a conspiracy to distribute cocaine.

Count Three charges the defendants with conspiring to commit

murder-for-hire, specifically the 1997 murders of Alex Ventura

and Aneudis Almonte.  Count Four and Five charges the

defendants with committing and aiding and abetting the

commission of the substantive crime of murder-for-hire in

connection with the 1997 murders of Alex Ventura and Aneudis

Almonte.  Count Six charges the defendants with using,

carrying, and possessing a firearm during and in relation to

the murder-for-hire charged in Counts Four and Five.

          The defendants, Mr. Diaz and Mr. Acosta, deny the

charges and have entered pleas of not guilty.  The law presumes

a defendant innocent of all charges until such time, if ever,

as the government proves each element of a charge by proof

beyond a reasonable doubt.  The presumption of innocence

remains with each defendant throughout the trial unless you are

convinced of the defendant's guilt beyond a reasonable doubt.

          Until it is time to deliberate at the conclusion of

the case, it is important that you keep an open mind.  You must

pay close attention to all of the evidence presented.  Evidence

consists only of the testimony of witnesses, documents, and

J3c6aco1

other things admitted as evidence or stipulations agreed to by
the attorneys.

Certain things are not evidence and must not be
considered by you.  I will list them for you now.  Statements,
arguments and questions by lawyers are not evidence nor are my
own statements to you.  So if a few moments the lawyers are
going to step up to the podium and the government is going to
make an opening statement because it has the burden of proof.
The defendants are not required to have their lawyers make
opening statements, but they have advised me that they wish to
make them and they are going to make their opening statements.
Those statements are not evidence.  They are simply the
lawyer's view of what they expect the evidence to be.

When I say questions are not evidence, let's say
somebody asked a question:  Did you have dinner with Derek
Jeter at the Four Seasons restaurant on August 27, 2017?  You
say, Derek Jeter?  Four Seasons restaurant?  August 27?  There
must be something here.  That question is evidence of nothing.
It's the witness's answer to the question that makes it
evidence.  Just asking a question is a big nothing.  It's the
answer that makes it evidence.

Secondly, something else that isn't evidence is
objections to questions.  Lawyers have an obligation to their
client to make an objection when they believe evidence is being
offered for an improper purpose under the rules of evidence.

J3c6aco1

You should not be influenced by the objection or by the Court's

ruling on it.  If the objection is sustained, ignore the

question and any answer that may have been given.  If it is

overruled, treat the answer like any other.  If you are

instructed that some item of evidence is received for a limited

purpose only, and I will tell you what that limited purpose is,

you must follow that instruction.  Testimony that has been

excluded or stricken or I told you to disregard ceases to be

evidence and must not be considered by you.  So somebody may

give an answer and I may say, Ladies and gentlemen, that answer

is stricken.  That is no longer evidence and may not be

considered by you.

        Anything you may see or hear outside the courtroom is

not evidence and must be disregarded.  You are to decide the

case solely on the evidence presented here in the courtroom.

        In deciding the facts of the case, you will have to

decide the credibility of the witnesses.  That is, how truthful

and believable they are.  How do you decide what to believe and

whatnot to believe?  Well, you are going to listen to the

witnesses, observe them, and then decide as you would decide

such questions in your ordinary everyday life.  Did they know

what they were talking about?  Were they candid, honest, open

and truthful?  Did they have a reason to falsify, exaggerate or

distort their testimony?  Sometimes it is not what a witness

says but how he or she says it that may give you a clue as to

J3c6aco1

1    whether or not to accept the witness's version of an incident

2    or an event as credible or believable.  In short, the way a

3    witness testifies may play an important part in your reaching a

4    judgment as to whether or not you can accept the witness's

5    testimony as reliable.  You will use your common sense and good

6    judgment to evaluate their testimony based on all the

7    circumstances.

8            Again, keep an open mind until the trial is over.  A

9    case can be presented only step by step and witness by witness

10   and it would be unfair to one side or the other if you were to

11   make up your mind before you had heard all of the evidence.  We

12   know from experience that we'll hear one person give his

13   version of events which sounds very impressive and compelling

14   and then we hear another person's version of the same event or

15   even the same person questioned about that event and what seems

16   so compelling and impressive may no longer be that way.  It may

17   have been weakened completely.  You'll use your common sense

18   and good judgment to evaluate the testimony based on all the

19   circumstances.

20           In order to assure that you decide the case only on

21   the evidence and that you not be influenced in any way by

22   anything that might occur outside the courtroom in your

23   presence, I must give you a specific set of instructions.

24   First, do not discuss the case among yourselves or with any

25   other person.  You will have the opportunity and indeed the

J3c6aco1

1    duty to discuss the case among yourselves only after the

2    evidence is in and the case is given to you to discuss and

3    decide in the jury room.  That means when you go back in the

4    jury room after a witness testifies, you don't say, What did

5    you think of that witness?  Wow, that was quite something.

6    Absolutely not.  That's discussing the case.  Talk about the

7    weather.  Talk about it's going to be springtime.  Talk about

8    the Yankees if you must or the Metz, which is my team, but not

9    the case.  Talking about a witness or even a lawyer, keep it to

10   yourself for the now.  In deliberations, you can talk about the

11   evidence among yourselves.

12        Next, you are not to read anything in newspapers or

13   elsewhere about the case or listen to any reporting on the

14   Internet, television, radio.  Not that I expect there will be

15   any, but you are not to do that.

16        This is extremely important, that you not conduct any

17   research about any aspect of the case on the Internet.  You are

18   not to Google or conduct any other search on any name, events,

19   terminology, laws, legal concepts, lawyers, or any matters

20   touching in any way upon the trial.  It is a violation of your

21   oath as a juror and a violation of this Court's order for you

22   to seek out on your own information about any matter touching

23   upon the trial including the people and events or to research

24   the law.  Your considerations must be based only on what you

25   hear and observe in the courtroom.  I want you to think about

1    if your family were involved in a criminal case either because

2    someone close to you was accused of a crime or may have been a

3    victim of a crime.  You would want jurors who followed this

4    rule.  Why?  Because so often you read something and then when

5    you hear the whole story, it turns out to be nonsense, garbage,

6    rubbish, not reliable.  There is an easy answer to it and you

7    are depriving one side or the other of the opportunity to give

8    their answer when you do your own research.  If it is

9    important, the parties will bring it out in the trial or the

10   government will bring it out in the trial if they elect to do

11   so and the defendants will have an opportunity to respond if

12   they choose to do so or to question the evidence.  That's what

13   is fair, ladies and gentlemen, and that's what is just and that

14   is the rule you will follow in this case.

15           The next rule is do not send or receive any electronic

16   communications about the case.  This includes texting,

17   emailing, blogging, posting information on social media

18   websites or using other electronic communications to discuss or

19   even mention this case.  So you don't post on your Facebook

20   page, I was selected today to be a juror in a case.  I cannot

21   tell you anything else about it.  No.  You don't even post, I

22   was selected to be a juror in a case.  You don't email

23   attorneys.  You don't email each other about the case.  You

24   don't email or contact witnesses.  It's blackout about this

25   trial while this trial is going on.

J3c6aco1

        Now, if it becomes necessary to send the Court a note
about something you saw or heard or any other matter, do not
share the note with your fellow jurors.  If the note describes
a circumstance that might cause you to step aside as a juror,
then it is not information that any other juror should know
about.  So it is not rude or impolite.  If you saw something or
you heard something, you don't come in the morning and say, You
know I heard something or I saw something.  Do you think I
should tell the judge about this, and you explain what it is
you saw and you heard.  That's compounding the problem.  Each
of you will understand if it becomes necessary for a juror to
send a note to the Court through the deputy that that is a
private matter and it's in everyone's best interest that the
content of the note not be shared.  Nobody is being rude when
they do that.  So just understand that.

        You are not allowed to speak to anyone about the case.
If you are approached by someone to talk about it, politely
tell them that the judge has directed you not to do so.  If any
person seeks to contact you about the case, and I doubt that
will happen, you are required to report the incident promptly
to me.

        Also, this is a public courtroom and if it happens
that somebody you know comes into the courtroom, that is fine,
but send me a note right away that a friend of yours or a
relative has come into the courtroom.  Because it is important

J3c6aco1

1    that matters that take place out of the presence of the jury

2    not be shared with the jury.  There is a reason for some of

3    this.  We want to follow that.

4            Now, I have instructed the attorneys and parties in

5    this case that they are not to speak with the jurors, not even

6    to offer a friendly greeting.  So if you happen to get into an

7    elevator and one of the defense counsel is in that elevator,

8    they are not being rude when they totally ignore you and treat

9    you like a stranger.  They are just following my instructions

10   to them and you are to do the same thing.  They know who you

11   are and you know who they are.  But for these purposes, you are

12   going treat them as if they were a perfect stranger and not

13   even offer a friendly greeting.  Please don't take offense at

14   this.

15           Now, I mentioned about not discussing the case among

16   yourselves.  The other critically important part of that or

17   with anyone else.  So you don't go home at night and talk about

18   what the case is about.  You are the juror in the courtroom.

19   You are the person hearing the evidence.  The responsibility is

20   on your shoulder, not on your cousin or your spouse or your

21   significant other.  You'll have plenty of a chance to talk to

22   them about it when the case is over.  Remember what I said

23   about a little mystery in your life not being such a bad thing.

24   You can tell them, I am sorry, I am under a court order.  You

25   don't want to have to come visit me in jail because I violated

J3c6aco1

1      the court order so I cannot discuss this case.

2                  Now, I am going to allow the lawyers in this case if

3      they have to leave to take care of a matter related to the

4      trial.  Please take no offense to this.  This is in compliance

5      with my rules and may actually facilitate the trial.

6                  Finally, a few words about trial procedure.  The

7      lawyers will have their opportunity to make opening statements.

8      They are not evidence.  It is a preview.  After all the

9      evidence has been received, the lawyers then have an

10     opportunity to sum up.  They may review the evidence and make

11     arguments as to what conclusions they think you should draw

12     from the evidence.  Those arguments are not evidence either.

13     Then you will get my instructions on the law and then you will

14     go to the jury room to deliberate on the case.

15                 Without further adieu, I am going to give the

16     government an opportunity to deliver its opening statement.

17     They go first and last because they are the party with the

18     burden of proof.

19                 MR. CHIUCHIOLO:  Just before Christmas on a cold night

20     more than 20 years ago two young men were ambushed in a

21     stairwell of a Bronx apartment building.  The men had been

22     lured into that building by two young women who were paid by

23     armed killers waiting in the stairwell of that building.  One

24     of the armed killers was that man, Jose Diaz.  Jose Diaz

25     cornered one of the victims in the stairwell and pushed him to

J3c6aco1

1    the ground and as the victim begged for his life, Diaz pointed

2    a gun at him and said, Bye-bye, and shot him in the head.  The

3    other armed killer was known as Chucky because his weapon of

4    choice was a knife like in the horror film.  Chucky grabbed the

5    second victim and put him any chokehold and stabbed him in the

6    neck, the back, and the chest again and again.  Both victims

7    were brutally murdered that night.

8         Now, this was not just some random attack in the

9    Bronx.  This was a setup.  Why were both victims lured to their

10   deaths that night?  Because the victims stole money from the

11   wrong man.  The victims stole hundreds of thousands of dollars

12   from that man, Robert Acosta, a drug boss.  Acosta ran a

13   large-scale cocaine trafficking organization in the 1990s.  The

14   two victims worked for him.  But when they stole money from

15   him, Acosta paid to have them killed.  That is why we're here

16   today, because 22 years ago in 1997 the defendants worked

17   together to kill the victims, Alex Ventura and Aneudis Almonte.

18        Ladies and gentlemen, this opening statement is the

19   government's opportunity to give you an overview of the case

20   and the evidence that we expect you will see and hear.  First,

21   I will tell you what the government expects the evidence to

22   show in this case and second I will talk about how the

23   government intends to prove the case.  That is, the types of

24   evidence we expect you to hear and see during this case.  So

25   let's start with what the evidence will show.

J3c6aco1

1          During the course of this trial, you are going to

2     learn that in the 1990s, Robert Acosta ran a large-scale

3     cocaine distribution organization in northern Manhattan.  One

4     of the Acosta's drug spots was located on 149th Street and

5     Amsterdam in Manhattan.  The murder victims worked for Acosta

6     at that location on 149th Street.  Now, Acosta also had a stash

7     apartment located on 156th Street and Broadway in Manhattan.

8     He used that location to store drugs and money.  The stash

9     apartment had a secret compartment or trap located under the

10    floorboards where Acosta would keep piles of cash that his drug

11    organization brought in every day.

12          Aside from Acosta, only one other person had a key to

13    the stash apartment on 156th Street and Broadway, Hinton

14    Ventura, one of Acosta's drug lieutenants.  Now, Hinton's

15    brother was one of the murder victims, Alex Ventura.  A few

16    months before the murders, Alex and his best friend Aneudis did

17    something very foolish.  They decided to steal money from that

18    stash apartment.  During the summer of 1997, Alex copied

19    Hinton's key to the stash apartment and he went to the

20    apartment with Aneudis, opened that secret trap and stole

21    somewhere in the neighborhood of $200,000.  After stuffing the

22    cash into a duffel bag, the two men ran to a car driven by

23    Alex's girlfriend at the time.

24          Now, when news of the robbery got back to Acosta, he

25    was livid.  He immediately suspected Hinton because Hinton was

J3c6aco1

the only other one with a key to the apartment, but he also
suspected Aneudis because he and his friend Alex both started
flashing unexplained wealth after the robberies.  They started
buying new clothes, new jewelry, went to clubs every night, and
even bought a new car.  So how did Acosta respond?  He
retaliated in the most direct and brutal way possible.  He
ordered that Hinton and Aneudis be killed.

          Now, the intended victims worked for Acosta so he
could not have them killed by someone in his own crew.  He
needed someone from the outside, someone with no connection to
his drug organization.  Acosta turned to someone named Richard
Collado.  Collado was an old family friend and someone who
himself was involved in drug distribution at one point.  Acosta
asked Collado to find someone to kill Aneudis and Hinton.  Now,
Collado said he didn't want to be involved in a murder but that
he would find someone to give the boys a beating of their
lives.  So to that end Collado introduced Acosta to Diaz and
Acosta hired Diaz for the job.  Unknown to Collado, though,
Acosta and Diaz changed the plan.  That beating became a
killing and Diaz brought in one of his friends, Chucky, to
complete the job.  Two victims.  Two killers.

          Now, remember, Acosta thought that Hinton robbed him,
not Alex.  So on Thanksgiving night a few months after the
robbery, Diaz and Chucky shot at Hinton and his girlfriend as
they were driving home from a nightclub.  Hinton was wounded

J3c6aco1

1    but he lived.  When Collado learned about the shooting, he

2    confronted Diaz about it because he thought it was going to be

3    just a beating, but Diaz told Collado to mind his own business,

4    that The Boss, Robert Acosta, had changed the plans.

5                    (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MR. CHIUCHIOLO:  A little more than three weeks later,

2     just a few days before Christmas, Diaz executed that plan.

3           Now, Diaz had to find a way to lure the two men out of

4     their neighborhood, the neighborhood where they were

5     comfortable and they had friends.  So Diaz developed a simple

6     but ingenious plan.  He found two young attractive women to

7     lure the young men out of their neighborhood.  The victims met

8     these two women at a restaurant near the drug spot, near that

9     149th Street drug spot.

10          The night after they met, the victims went out to a

11    club with these two women, and then several days later the

12    victims left that drug spot early to meet the girls at an

13    apartment building.  Before leaving, the victims picked up

14    condoms and a bottle of liquor, and then set out for the Bronx

15    to a building miles away from where they worked and where they

16    lived.

17          The victims thought that they were meeting the two

18    women in that building.  But instead, waiting for them in that

19    stairwell were Diaz and Chucky.  Chucky grabbed Aneudis Almonte

20    in a chokehold from behind, stabbing him in the chest, the

21    back, and the neck, and the final blow through the heart.  Diaz

22    grabbed Alex Ventura, threw him to the ground, and shot him in

23    the head from a pointblank range.

24          For these murders, these cold-blooded murders, Acosta

25    paid Diaz $10,000.  $10,000 for two lives.  For Acosta, $10,000

J3C8ACO2                        Opening - Mr. Chiuchiolo

1   for revenge, $10,000 to protect his lucrative drug

2   organization.

3        Ladies and gentlemen, that's what this case is about.

4   Two young men stole from Acosta's drug organization, Acosta

5   hired Diaz to kill them, and Diaz and Chucky murdered Alex

6   Ventura and Aneudis Almonte.

7        Now, how will the government prove its case?

8        First, the government will prove that Robert Acosta

9   operated a lucrative drug business in northern Manhattan in the

10  90s.  You will hear testimony from retired NYPD detectives who

11  arrested Acosta and others in 1994 at that 149th Street

12  location for selling drugs.  The detectives seized evidence

13  from that spot, including large amounts of cocaine, drug

14  paraphernalia, cash and guns.

15       You will hear of another of Acosta's drug spots, this

16  one located on Edgecombe Avenue in Manhattan.  You will learn

17  that law enforcement seized drugs, money and guns from that

18  location in 1994.  You will even get to see some of those guns

19  in the courtroom.  And you will learn that a fingerprint lifted

20  from the Edgecombe spot matches Robert Acosta.

21       You will also hear testimony from several people who

22  actually worked for Acosta.  They will tell you how the drug

23  organization worked and what their roles were.

24       Then you will hear testimony about the events leading

25  up to the murders.  You will hear from a witness who helped

J3C8ACO2                        Opening – Mr. Chiuchiolo

1    Alex and Aneudis, the victims, steal Acosta's money from a

2    stash apartment.  You will see a photograph of the stash

3    apartment, and you will even get to see photographs of that

4    trap where the money was hidden.

5         Then you will hear about the murders.  You will hear

6    from a police officer who collected evidence from the crime

7    scene, including the bottle of liquor and the condoms that the

8    victims brought with them that night.

9         You will hear that Almonte was stabbed multiple times

10   and that Ventura was shot in the head.

11        You will also see evidence that connects Diaz to that

12   apartment building in the Bronx, which explains why he chose it

13   as the murder scene.

14        Finally, you will hear from a witness with inside

15   knowledge of this murder for hire.  Richard Collado, the man

16   who Acosta asked to set up the murders, he is going to testify.

17   Collado will explain to you how he knew Acosta and how Acosta

18   asked him to find someone to murder the victims.  He will

19   explain how he introduced Diaz to Acosta, and how Diaz was

20   asked to commit a beating, but the plans changed and it

21   eventually became murders.

22        Mr. Collado will explain to you that after the

23   murders, Diaz explained to him in vivid detail exactly how the

24   murders were committed.  How Diaz told him that he recruited

25   the two women to lure the victims, that he ambushed the victims

J3C8ACO2                        Opening – Mr. Chiuchiolo

1      in the stairwell, and how Alex Ventura begged for his life

2      before Diaz shot him in the head.

3              Now, make no mistake about it, Mr. Collado has

4      committed serious crimes in his lifetime.  But he will tell you

5      that he never intended for this to be a murder.  Soon after the

6      murders, Collado felt tremendous guilt.  So what did he do?  He

7      went to the police.  You will learn that in 2000, Collado

8      identified Diaz and Chucky as the murderers, and he told law

9      enforcement that Acosta was the one who paid for the murders.

10             Now, you will hear that Mr. Collado is testifying

11     under what is called a grant of immunity, which means he cannot

12     be prosecuted for the statements he makes here in court unless

13     he lies.  And you will hear that Collado came forward in this

14     case on his own.  These murders happened a long time ago.  He

15     could have stayed quiet.  He could have stayed home.  But he

16     chose not to.  Because he feels guilt.  Because he wants to do

17     the right thing.

18             Now, you may not agree with Collado's decision to

19     introduce Acosta to Diaz, and you may not agree with Collado's

20     distribution of drugs.  But at the end of the day, the question

21     is not going to be whether you agree with every decision Mr.

22     Collado has ever made in his life.  It will be whether you

23     believe what he tells you under oath about the murders.  So

24     please listen carefully when Mr. Collado testifies.  Scrutinize

25     what he has to tell you and consider whether what he tells you

J3C8ACO2                         Opening – Mr. Weinstein

1    is consistent with all the other testimony you are going to

2    hear and see.

3           Ladies and gentlemen, over the course of this trial,

4    you are going to hear and see a lot of different types of

5    evidence.  But at the end of the day, what happened in this

6    case is not all that complicated.  Two of Acosta's workers

7    stole from him, so he had Diaz kill them.

8           Now, at the end of this trial, the government will

9    have another chance to speak with you, and we will explain how

10   the evidence you have seen establishes each of the charges

11   against the defendants.  But between now and then, I am going

12   to ask you to do three things:

13          First, listen to the evidence;

14          Second, follow Judge Castel's instructions on the law;

15   and

16          Third, use your common sense, the same common sense

17   that you use in your lives every day as New Yorkers.

18          If you do those three things, the defendants will get

19   a fair trial, the government will get a fair trial, and you

20   will reach the only conclusion supported by the evidence.

21          The defendants are guilty.

22          THE COURT:  Thank you.

23          For defendant Acosta.

24          MR. WEINSTEIN:  Thank you, your Honor.

25          Good afternoon, ladies and gentlemen.

1          What you heard the government representative tell you

2     is what they would hope to, like to, wish to prove.  You have

3     heard no evidence, as his Honor told you.

4          He is right and his Honor is right.  This is a case

5     about the credibility.  As the assistant just told you, it's

6     essentially about Richard Collado.  I want you to examine him,

7     his demeanor, how his answers come out on direct as opposed to

8     cross-examination, if there is a radical difference between the

9     two.  It is not only what someone says, because someone can say

10    anything; it is how they say it, the manner in which they say

11    it, how they respond when questioned by the person who is not

12    calling them as a witness.  Take into his background, his long,

13    long history of crime.  He his testifying under a grant of

14    immunity, which means he's untouchable; he cannot be prosecuted

15    for this murder.  And you will hear -- and it will probably

16    come out on cross-examination -- his responsibility for the

17    murder.

18         When you're listening to the witnesses, you are going

19    to hear different versions that they gave at different times,

20    different versions from the 1990s to the 2000s and teens, and

21    all of a sudden the memory gets a lot better 16, 18, 20 years

22    later.

23         But Collado is the man driving the government's ship.

24    Mr. Collado at one time had been a big guy in the drug

25    business, and Hinton was my client's lieutenant.  And you will

hear evidence, I believe, that the boys, workers for Robert, were jealous of him, they wanted to be him, and Collado was the driving force behind everything.

You heard the government tell you that Collado, on his own, out of his good nature, came forward and said, listen, I have been having a sleepless night and I have got to tell you, a couple of years ago I was approached by Mr. Acosta to find someone who could -- and you will hear what he told back then to the police -- give someone a beating, give him a lesson, teach him a lesson.

You will also hear that Collado paid the money to the supposed killer. Collado is the one who gave the instructions to this person, not Mr. Acosta. Collado was the last person to speak to this person supposedly before the deed was done. Collado gave the money. But he has immunity.

And Collado also -- what the government didn't tell you yet -- was a confidential informant, from years before and years after. And while he was a confidential informant, you're not supposed to double deal. He never got out of the drug business. He gets a pass on all that too. He stayed in the drug business. And he and Robert Acosta were working together. And he would get the people, the customers for Robert. And the money that was taken came from a connection from Mr. Collado.

So when Mr. Collado wakes up with a sleepless night, well, something happened before he woke up with a sleepless

1    night two years later.  He had to get rid of Robert Acosta.

2    And he has an informer and he has a handler, and he has to have

3    a special relationship with his handler.  You're not supposed

4    to commit crimes.  That means giving money to somebody and say,

5    beat somebody and kill somebody, giving them instructions.  And

6    they are supposed to let their handlers and the other officers

7    know that something is going down.  That's what an informant

8    does.  They set up people for the government to make arrests,

9    mostly drug cases here, but to set up people.

10          If this were a setup that Mr. Acosta was doing to have

11   people beat up or even killed, Collado is an informant.  He

12   knocks on his handler's door.  I just heard something.  We have

13   got to stop this.  You people all have seen sting operations.

14   OK.  Make believe you hire somebody, there will be two

15   government agents, boom, no one gets hurt and the bad guy gets

16   arrested.  That doesn't happen.

17          What does Collado do?  How can I get Acosta?  I know.

18   I will go to my handler and tell him, I am working out a

19   thousand kilo deal with Robert Acosta.  And there are recorded

20   conversations.  And this way we will get Robert Acosta.  He is

21   out of the way.  A thousand kilo deal.  He's gone.  And out of

22   that deal, Collado being a paid informant, he is getting money

23   from the government, he will get a big piece of the pie because

24   he gets a percentage of all the drugs and money that come in.

25   They record the conversations.  Robert doesn't bite.

1            And the government tries to say, well, he didn't say

2      anything two years earlier about these homicides because he was

3      afraid of Robert.  That makes no sense at all because Robert

4      hadn't seen Collado in ten years because Collado is about 15

5      years older than Robert.  Supposedly he asked, do you have any

6      muscle?, knowing Collado's reputation, that Collado had

7      threatened people in the past.  That doesn't work.

8            Let's come up with another idea.  Supposedly Collado

9      was holding a gun and a bulletproof vest for Robert Acosta that

10     he gave to his brother, Collado's brother.  And Collado hatches

11     a scheme this time, with his handler, his officer.  Let's tell

12     Robert I'm arrested and you got to get the gun out of my house

13     because the cops are going to come there and find me with a

14     gun.  You have got to do that.  OK?  And you have got to bail

15     me out.  What doesn't Robert do?  Robert doesn't go pick up the

16     gun.  Strike two.

17           More time passed.  By the way, I forgot to tell you,

18     this guy Robert, who we tried to set up twice, he came up to me

19     and had these people beat up or whacked or whatever.

20           This is the witness.  Essentially their whole case is

21     Mr. Collado.  They are going to ask you to convict -- and this

22     is two defendants with essentially two separate trials, and I

23     am only talking about my client -- Mr. Acosta of these heinous,

24     heinous crimes, based on a man who lied to everybody.  He lied

25     to the government, his informants.  And does it make any sense

1    that he would wait two years after trying to set him up twice?

2    It doesn't.

3           Look at motives to lie, absolute lies.  And you are

4    going to see the witnesses that the people parade out of

5    basically a rose gallery.  Immunity agreement, cooperation

6    agreement, cooperation agreement, criminal records.  All have

7    something to protect, especially Mr. Collado; he has the most

8    to protect.  And he got a get-out-of-jail-free card, because

9    after he was unable to set up Robert Acosta twice, he says,

10   OK, I have got a good one.  Because there are no eyewitnesses

11   to this.  Everything flows from the mouth of Mr. Collado,

12   everything.  This fine, upstanding man, who had trouble

13   sleeping one night, and said, hey, I have all this information.

14          The government said, and quite correctly, that their

15   opening statement is a preview of the case they would like to

16   prove.  True.  We all like to go to the movies, and my favorite

17   time of a movie is to watch the coming attractions.  You see

18   four or five trailers and you say, this one I have really got

19   to see, I saw a minute and a half of it, it looks great.  So

20   you take your significant other and you go to the movies.  That

21   wasn't what the trailer was about.  This is the trailer, their

22   opening statement.

23          I submit to you, when this case is over, the movie

24   will not match the trailer.  So I am asking you people to, as a

25   the prosecutor did, use your common sense, your logic.  There

J3C8ACO2                       Opening – Mr. Miedel

1   is no one side favoring the other side.  As his Honor said,

2   this is an even playing field.  Because a witness is a criminal

3   or a special agent, you have to listen to him, no matter what

4   their jobs are, and decide based on their backgrounds if they

5   are telling the truth, if they are shading it.  Look for the

6   inconsistencies not only within one's testimony, but compared

7   to other people.  What a witness may have told the police in

8   1997 and 1998 and now the story changes when they are

9   interviewed the next time 15, 16 years later.

10          It's for you people.  Use your common sense, your

11  intelligence, your logic, and follow his Honor's law, to the

12  letter of the law.

13          Thank you.

14          THE COURT:  Thank you.

15          On behalf of defendant Diaz.

16          MR. MIEDEL:  Good afternoon.

17          This is a murder case.  There is no case more serious.

18  And what that means is that you, the jurors, have an awesome

19  responsibility.  You have a tremendous responsibility.  Because

20  at the end of this case, when it's time to deliberate, you will

21  have the life, the future, the freedom of a person, a fellow

22  human being in your hands.  And what we are asking you today,

23  begging you today, is to take that responsibility as serious as

24  you would about the most important thing in your life.  Because

25  what happens here is the most important decision that has ever

J3C8ACO2                         Opening - Mr. Miedel

1   been made about Jose Diaz.

2            My name is Florian Miedel, and Susan Marcus and I have

3   the privilege of representing Jose Diaz, who is sitting over

4   there at counsel table.

5            There are two things I want you to know at the outset.

6   The first is that Jose Diaz is innocent.  He did not commit

7   this murder 21 years ago.  The government arrested the wrong

8   person.  By sitting here in court, he is telling you, I am

9   innocent.  He is telling you, by contesting these charges, I

10  didn't do this.  As the judge said, and will continue to say to

11  you, Mr. Diaz is presumed innocent.  But he is not just

12  presumed innocent, ladies and gentlemen; he is innocent.

13           The second thing I want to tell you is that -- and

14  this is crucial for you to understand -- this is not one trial,

15  this is two trials.  You must determine whether the government

16  has offered actual proof beyond any reasonable doubt, and you

17  must determine that for each of these two men, separately.

18  They are separate.  The evidence must be analyzed separately.

19           For example, the government is going to start, in its

20  first day and a half of testimony, talking about an incident

21  that happened in 1994.  You need to understand that those

22  events have nothing to do with Jose Diaz.  Even the government

23  will say so.  And that's just an example.

24           Now, I have talked to you about the tremendous

25  responsibility that you have in this case.  And what do I mean?

J3C8ACO2                        Opening - Mr. Miedel

Well, we know the government thinks Mr. Diaz is guilty.  They

have already told you that.  But what the government believes

is not the issue, is it?  It's not about what the government

believes.  If we simply went by who the government believes is

guilty, well, we wouldn't need you, right, the jury.  But the

founders of our country decided that the role of the jury was

so important that they made the right to a jury trial one of

the fundamental rights that we have.  And why do you think they

did that?  Because someone -- you -- has to stand between the

full force of the government and the single individual.  And

that's a jury.

        So it's your job to determine whether the government's

belief of guilt is actually based on actual real proof, proof

that goes beyond any reasonable doubt, or whether it's based on

conjecture or assumptions or hunches or tunnel vision.  It's

your job to put the government to the test.  And it's your job

to stand up to them if you think the evidence didn't prove

guilt beyond a reasonable doubt, or the lack of evidence made

you have doubts.

        Now, you have just heard what the government believes

the evidence is going to be in this case.  And when I say the

role of a jury is to stand between the government and the

individual, to put the government to the test, to hold the

government accountable, to ask questions, to be critical, to

make sure the government isn't just giving you inferences, what

J3C8ACO2                    Opening – Mr. Miedel

1    do I mean?

2           THE COURT:  This is a preview of the evidence.

3           MR. MIEDEL:  I will get to it, your Honor.

4           Let's take a closer look at what we will see in this

5    case and what we won't see.

6           Now, you're new to the case and you're just hearing

7    about it for the first time, so you may have missed this in the

8    prosecutor's opening so I just want to make sure we are all on

9    the same page here.

10          There is not a single eyewitness who will come in and

11   say that Jose Diaz killed anyone.  There will be no young woman

12   coming in and testifying and say that she lured the victims

13   into this building.

14          There is no physical evidence in this case linking

15   Jose Diaz to this crime.  What do I mean by that?  There was

16   DNA, but it's not his.  There are no fingerprints.  There is no

17   blood evidence.  There's no hairs.  There's no fibers,

18   footprints, whatever.  Nothing.  No objective evidence

19   whatsoever that says that Jose Diaz committed this crime.

20          So why are we here?  Well, in 2015, 18 years after the

21   murder, a detective was assigned a 20-year-old murder that

22   hadn't been solved.  And he poured his heart and soul into

23   trying to solve this murder.  He became obsessed with solving

24   it, even though the pieces didn't all fit.  It was an old case

25   and there was a lot of information that was missing.  So he and

1    the prosecutors and the government began to motivate people, to

2    incentivize people.  And in the end, as you will see at this

3    trial, every single witness against Mr. Diaz —— and there will

4    not be many —— every single witness is motivated by something.

5    Every single witness is employed by the government in one way

6    or another, bought and paid for.

7            So this is a case about motivation, about

8    incentivizing.  And what am I talking about?  Well, let me

9    start with the government's central witness.  You have already

10   heard a lot about him.  Richard or Ricardo Collado.  The only

11   witness you will hear from in this entire trial who claims that

12   Jose Diaz committed this murder.

13           Now, he says he helped set up the murder.  He wasn't

14   there.  He didn't see it.  But he says that he put this murder

15   into action.  So what is his motivation?  Well, you will hear.

16   For one, to buy his testimony, the government has not charged

17   him with the murder, even though he says he planned it.  Not

18   only that, they have promised him never to charge him with this

19   murder in the future, any time.  That's what immunity is.

20           MR. CHIUCHIOLO:  Objection.

21           THE COURT:  Overruled.

22           MR. MIEDEL:  And on top of that, just to put some

23   extra icing on the cake, ladies and gentlemen, they have also

24   promised not to prosecute him for selling kilos of cocaine as

25   recently as four or five years ago.  Why?  Well, in exchange

J3C8ACO2                         Opening - Mr. Miedel

1  for something.  They have promised not to prosecute him for the

2  murder, not to prosecute him for selling kilos of cocaine, in

3  exchange for laying the blame of this murder at Jose Diaz's

4  feet.  If that's not strong motivation, I don't know what is.

5          So the government has hitched its wagon to Richard

6  Collado, and you will see that in this trial.  But this wagon

7  is missing a wheel.  Why do I say that?  Well, this is what you

8  will learn about Richard Collado.  You will learn that he has

9  been, for much of his life, a professional informant.  What do

10 I mean by that?  Well, he has committed extremely serious

11 crimes.  He has sold vast amounts of cocaine and other drugs.

12 He has carried guns.  He has threatened people.  And then, to

13 get out of the mess that he created over that time period, to

14 avoid responsibility for what he did, he has pointed the finger

15 at other people.  He has done it to save himself, and he has

16 done it for money.  $20,000, to be exact, he has been paid by

17 the government.  That's not nothing.

18         You will also learn that Richard Collado is a

19 professional, if not a pathological liar.  As you already

20 heard, he worked for the DEA as an informant, while at the same

21 time selling vast amounts of drugs without telling his DEA

22 handlers.  He lied repeatedly to them.  Lying was like second

23 nature to him, and you will learn that during the course of the

24 trial.

25         You will learn, as you have already heard a little

1    bit, that he tried in 1999, a year and a half or so after the

2    murders, he tried to set up Robert Acosta.  He tried to

3    convince his DEA handlers that Robert Acosta had been involved

4    in a thousand kilo drug deal, which he wasn't.  He tried to

5    convince his DEA handler that Acosta was in possession of a

6    handgun, which he wasn't.

7         And you will learn that finally, two years, literally

8    two years after the murder, when he couldn't get the DEA to

9    bite on the thousand kilo deal, and he couldn't get the DEA to

10   bite on the handgun, well, then he says, oh, yeah, by the way,

11   Acosta was also involved in setting up a murder two years ago.

12   That's the first time anyone ever hears about it, despite

13   numerous opportunities.  He met with his DEA handler many, many

14   times before that and never said a word.  He had the gall to go

15   to the funerals of the victims in this case and to talk to the

16   mother of one of the victims, who he was close with, and not

17   say a word, not a word.

18        Now, you will see now, 21 years later, he is going to

19   come in and testify on this witness stand, and he is going to

20   appear elderly, somewhat frail, a man who speaks softly, who

21   doesn't raise his voice.  And it may be hard for you all to

22   jive that vision of him with the guy he was 20 years ago, the

23   one who set up huge drug deals, who carried guns, who was a

24   big-time criminal.  Don't let the passage of time soften him.

25   Don't let it fool you.  He was engaging in kilo quantity drug

J3C8ACO2                        Opening - Mr. Miedel

1    deals as recently as four years ago.  He remains the same

2    untrustworthy, unreliable, lying man he has always been.  And

3    that's the man the government has hitched its wagon to.

4              So the questions that you will have to ask yourselves,

5    as you listen to his testimony, at the end of the trial are:

6    Would I trust Richard Collado with the most important matter in

7    my life?  Would I trust him to watch my kids?  Would I trust

8    him to tell the truth about something significant?  Would I

9    trust him with my freedom?  Because I can tell you, Jose Diaz

10   wouldn't.  But he doesn't get to make that decision.  He is

11   forced to rely on you to make that decision for him.

12             You will also see, ladies and gentlemen, that Richard

13   Collado is not the only witness motivated or incentivized by

14   the government, on the government's payroll, so to speak.  In

15   fact, you will learn that every witness who has something

16   negative to say about Jose Diaz -- and again, I said there

17   won't be many -- every witness is motivated in one way or

18   another by the government, and I want you just to listen to the

19   testimony of those witnesses very carefully.

20             So this is a case about motivation.  It's also a case

21   about dates.  Dates matter in this case, because they make you

22   realize, and they will make you realize, that there is

23   something weird going on here.  There is something rotten about

24   this case.  You will have to ask yourselves some questions as

25   you listen to the testimony.  For example, this murder happens

1    in December of 1997.  As I already told you, Richard Collado

2    waits two years to tell anyone about what he supposedly knows,

3    and only once he is motivated by self-interest.  So you should

4    ask yourselves why.  Doesn't that cast a dark shadow on his

5    trustworthiness.

6           Then the police investigate.  Collado picks out photos

7    of Diaz and Chucky as the supposed killers and Robert Acosta

8    who supposedly hired them.  And you will learn that in the year

9    2000, the police had essentially the same evidence the

10   government has now, still based entirely on Richard Collado.

11   Not much changed, but nobody gets arrested, nobody gets charged

12   until 16 more years.  You should ask yourselves why.

13          Another date, June 9, 2016.  The police visit Jose

14   Diaz at his home.  This is 18 months before he gets arrested.

15   They question him about the murder.  He is cooperative.  He is

16   pleasant.  He talks to them.

17          About a couple weeks later, June 21, 2016, the police

18   come back.  He is still there.  He hasn't gone anywhere.  He is

19   not hiding.  This time they ask him to provide a DNA sample.

20          MS. KORENBAUM:  Objection.

21          THE COURT:  Sidebar.

22          (At the sidebar)

23          THE COURT:  What is the basis?

24          MS. KORENBAUM:  Your Honor, we have not been noticed

25   with any expert notice if there is going to be a DNA expert

J3C8ACO2                        Opening - Mr. Miedel

1    testifying.  We don't intend to put this in.

2           MR. MIEDEL:  They may not bring it in.  Vazquez is

3    going to be testifying about how they went to his house, got a

4    DNA sample, how he learned that the DNA sample didn't match.

5           THE COURT:  Who learned that it didn't match?

6           MR. MIEDEL:  Vazquez.  If it doesn't come in through

7    them, we may --

8           THE COURT:  This is what I think is likely fair.  They

9    asked him for a DNA sample.  There is no reason why that

10   evidence can't come in.

11          MS. KORENBAUM:  It's the result of the DNA test.

12          THE COURT:  First of all, that did not come out.

13   Second of all --

14          MR. CHIUCHIOLO:  He said the DNA didn't match.

15          THE COURT:  He said it earlier.  OK.

16          MR. MIEDEL:  Surely long forgotten.

17          THE COURT:  At present, the present objection, it

18   hasn't come up.  Certainly it seems to me what is fair is he

19   can establish it was asked for, and then in closing he can say

20   you didn't hear any DNA evidence.  That's fair.  OK.

21          (In open court)

22          MR. MIEDEL:  I am getting close to the end, ladies and

23   gentlemen.

24          June 21, two weeks later, after the visit time they

25   visit Jose Diaz, the police come back.  He is still there.  He

J3C8ACO2                        Opening - Mr. Miedel

1   hasn't gone anywhere.  This time they ask him to provide a DNA

2   sample.  DNA was recovered from one of the victim's clothes and

3   they want to check it.

4          So what does this supposedly guilty Jose Diaz do?  He

5   says, Sure, go right ahead, take a sample, I have nothing to

6   hide.  And so they did.  And after a few more weeks they called

7   him, and he calls them back; still there, not hiding, not going

8   anywhere.

9          Ladies and gentlemen, over the next couple of weeks,

10  in addition to hearing what the prosecutors think is important,

11  you will also hear the lack of evidence, about what there

12  isn't.  And the judge is going to instruct you at the end of

13  this case that the lack of evidence is as important for you to

14  consider as the evidence.  And here is something to keep in

15  mind.  The government is going to come and argue to you at the

16  end of the trial, ignore the lack of evidence, ladies and

17  gentlemen, ignore the fact that there is no physical evidence,

18  no forensic evidence linking Jose Diaz to this crime, ignore

19  the fact that there is no eyewitness to this crime, ignore the

20  fact that all we have got is people saying stuff.  What we have

21  culled together here, that is enough, and you should convict.

22         No, it is not enough.  That's not how it works.

23  Because Jose Diaz didn't do it.  Why is there no physical

24  evidence linking Jose Diaz to this crime?  Because he didn't do

25  it.  Why is there no eyewitness who will testify that Jose Diaz

J3C8ACO2

1    shot this young man?  Because he didn't do it.  The lack, the

2    absence of evidence, is just as important in your final

3    decision as the evidence presented by the government.

4            I want to end on this, ladies and gentlemen.  Your

5    job, as I mentioned at the beginning, is so important.  Aside

6    from deciding to have a child, maybe how to parent it, you will

7    never make a decision about another human being as important as

8    this one.  Doing your job also means recognizing and

9    understanding that it is the government, the accuser, who is

10   required to prove guilt.  That's the way it is, and that's the

11   way it should be.  The accuser should be required to prove

12   guilt.  A person shouldn't have to prove their innocence.

13           THE COURT:  Overview of the evidence, please.

14           MR. MIEDEL:  So we are going to rely on you to take

15   your job seriously.  And we are also going to rely on you, at

16   the end of this trial, to stand up to the government and just

17   say, you want us to convict a man 21 years later, based on

18   someone's say-so, on the say-so of an admitted liar, who wasn't

19   even there, who didn't even see it, who was wrong about so many

20   crucial things; you want us to convict a man of murder when

21   there was no eyewitness, when there is no forensic evidence.

22   No, we will not.

23           Thank you.

24           THE COURT:  All right.  Thank you very much.

25           Ladies and gentlemen, it's time for our lunch break.

J3C8ACO2

1    So you will hear this from me quite often.  Please do not

2    discuss the case among yourselves or with anyone else.  Keep an

3    open mind.  You haven't heard a word of evidence yet.

4           Enjoy lunch, and I will see you back at 2:15.  Please

5    try and get here before 2:15 so you can go through security and

6    be ready in the jury room.  Thank you.

7           (Jury exits courtroom)

8           THE COURT:  Have a pleasant lunch.  Thank you.

9           (Luncheon recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J3C6ACO3

```
1              A F T E R N O O N   S E S S I O N

2                           2:15 p.m.

3           THE COURT:  Please remain standing and we'll bring the

4      jury in.

5           MR. KROUSE:  Your Honor, the government has a couple

6      small matters.

7           THE COURT:  We'll have to wait for the defendants.

8           MR. KROUSE:  Yes, your Honor.

9           THE COURT:  Yes, Mr. Krouse.

10          MR. KROUSE:  Your Honor, we just want to put on the

11     record the basis for the government's objections at opening.

12     One objection was on the statement that the government has

13     promised never to charge Mr. Collado; that is what immunity is.

14     We don't believe that is an accurate legal statement of what

15     immunity is.  That is not what the government has promised.  It

16     is not a non-prosecution agreement.  Use immunity for his

17     testimony.  So that is a misstatement of law.  That was the

18     basis for the government's objection to that statement of Mr.

19     Miedel.

20          The government lodged an objection that was addressed

21     at side bar.  Mr. Miedel made a statement that the DNA did not

22     match his client.  We don't believe that that's -- or at least

23     at the time the government had never made any expert disclosure

24     of the intent to call a DNA witness.  Mr. Miedel or defense

25     counsel for Mr. Diaz had never made an expert disclosure to the
```

J3C6ACO3

government of an intent to call a DNA witness.  We believe that
in light of that statement, the government may decide to call a
DNA expert witness and will assess whether that is the path the
government is going to take or whether a stipulation can be
entered into by the parties.  But that statement by Mr. Miedel
during his opening was made without any basis to believe that
that fact would ever come out in evidence.  So that was the
basis of the government's objection.  That's all, your Honor.

          Your Honor, the government also did have an objection
to just put on the record to the narrative that Mr. Miedel in
his opening laid out about the jury being a bulwark against
this overreaching government.  That is maybe a proper argument,
but it wasn't appropriate in opening and the government did
object to that.  The objection I believe was sustained when the
Court instructed Mr. Miedel to stick to the facts in the case.

          THE COURT:  All right.  I am going to give Mr. Miedel
an opportunity to respond and I think we should do it perhaps
after court today.  One that I would add to it and I don't
think there is anything that is necessary to be done here, but
the implication was that there is a sliding scale of beyond a
reasonable doubt.  That the more serious the crime, more that
is required to find beyond a reasonable doubt.  Less serious
crime, perhaps not as much.  If necessary I will give a
corrective instruction on that.  I thought about whether I
should do that, but at the moment I will hear from everybody on

J3C6ACO3

1    that.   For the moment we'll bring our jury in.

2              MR. KROUSE:   Thank you, your Honor.

J3C6ACO3

1              (In open court; jury present)

2              THE COURT:  Please be seated.

3              Good afternoon, ladies and gentlemen.  We're back in

4     action.  Note, there would be no reason that you would know

5     that so unless I told you this; but when you exit the

6     courtroom, you will always exit into the jury room and then

7     from the jury room out.  Once you exit, I stand here until the

8     last juror exists.  You are not permitted back in the courtroom

9     for any reason whatsoever until you are escorted back in by my

10    deputy or another member of my staff.  There is a reason why

11    the courtroom is closed.  These are matters and things that go

12    on in the ordinary course.  So it is very important that you

13    follow that rule.  If you think you are going to need something

14    that is in the courtroom, get it right away.  That's the rule

15    on that.

16             The government may call its first witness.

17             MS. KORENBAUM:  Thank you, your Honor.  The government

18    calls Michael Callahan.

19             THE DEPUTY CLERK:  Raise your right hand.

20    MICHAEL CALLAHAN,

21         called as a witness by the Government,

22         having been duly sworn, testified as follows:

23             THE DEPUTY CLERK:  Please be seated.  State your name

24    and spell it for the record, please.

25             THE WITNESS:  Michael Callahan, C-a-l-l-a-h-a-n.

1           THE COURT:  You may inquire, Ms. Korenbaum.

2           MS. KORENBAUM:  Thank you, your Honor.

3    DIRECT EXAMINATION

4    BY MS. KORENBAUM:

5    Q.  Good afternoon, Mr. Callahan.

6    A.  Good afternoon.

7    Q.  Are you currently employed?

8    A.  Yes, I am.

9    Q.  Where are you employed?

10   A.  I am employed for a company called P.C. Richard & Son.

11   Q.  What do you do for P.C. Richard & Son?

12   A.  I am the director of security for P.C. Richard & Son.

13   Q.  Is that for all the P.C. Richard & Sons?

14   A.  Yes, ma'am.

15   Q.  Did you ever work for the New York City Police Department?

16   A.  Yes, I did.

17   Q.  I am going to call that NYPD for brevity's sake.

18           What years did you work for the NYPD?

19   A.  January 1985 through January 2005.

20   Q.  What was your title upon retiring from the NYPD?

21   A.  Detective third grade.

22   Q.  I would like to focus you on 1994.

23           At that time what unit within NYPD were you assigned

24   to?

25   A.  I was assigned to the Manhattan north narcotics major case

J3C6ACO3                        Callahan - direct

1    unit.

2    Q.  In the spring of 1994 were you involved in an investigation

3    of a drug organization located in the vicinity of 149th Street

4    and Amsterdam Avenue in Manhattan?

5    A.  Yes, I was.

6    Q.  Were you working with other members of the NYPD as a team

7    on that investigation?

8    A.  Yes.

9    Q.  Do you recall, Mr. Callahan, what was the initial source of

10   information that led to the investigation?

11   A.  We -- I had been contacted by a confidential informant who

12   provided us with information about this organization.

13   Q.  Can you just tell the jurors what a confidential informant

14   is?

15   A.  Confidential informant is somebody who provides criminal

16   information to law enforcement and the information that that

17   person provides we protect their identity and we issue them a

18   confidential informant number.  His information is -- the

19   person's information is now sealed and kept down at police

20   headquarters.

21   Q.  Mr. Callahan, do you recall who the main target of the next

22   spring 1994 investigation was?

23   A.  Yes.

24   Q.  Who was that?

25   A.  Robert Acosta.

88

J3C6ACO3                         Callahan - direct

1          MS. KORENBAUM:  Ms. Fetman, can you bring up on Mr.

2     Callahan's screen only what is marked for identification as

3     Government Exhibit 1.

4     Q.  Is that up there, Mr. Callahan?

5     A.  No, not yet.  It still has the little hourglass.

6          THE COURT:  As do I on my screen.

7          Oh, something is happening now.

8          THE DEPUTY CLERK:  Not to the jury?

9          THE COURT:  Not to the jury.

10          MS. KORENBAUM:  Your Honor, I do have a hard copy if

11     we want to speed things up.

12          THE WITNESS:  Here we go.

13          THE COURT:  It's up.

14          THE DEPUTY CLERK:  Do they?

15          MS. KORENBAUM:  They shouldn't.

16     BY MS. KORENBAUM:

17     Q.  Mr. Callahan, do you see what has been marked for

18     identification as Government Exhibit 1 on your screen?

19     A.  Yes, ma'am.

20     Q.  Do you recognize that person?

21     A.  Yes.

22     Q.  Who is it?

23     A.  That is Robert Acosta.

24     Q.  Was that the main target of the spring 1994 investigation?

25     A.  Yes, ma'am.

J3C6ACO3                          Callahan – direct

1            MS. KORENBAUM:  Government offers Exhibit 1, your
2    Honor?

3            THE COURT:  Any objection.

4            MR. MIEDEL:  No objection.

5            THE COURT:  Received it.

6            (Government's Exhibit 1 received in evidence)

7            MS. KORENBAUM:  Can we put it up on the jurors'
8    screens, please.

9            THE COURT:  Can you see it, ladies and gentlemen?

10           JUROR:  No.

11           THE COURT:  Once it is received in evidence, you may
12   publish.

13           It may be taking a moment to publish.

14           JUROR:  It says, "Input signal out of range."

15           JUROR:  It's all black now.

16           MS. KORENBAUM:  Your Honor, I can publish the hard
17   copy if you would like.

18           THE COURT:  That's fine.

19           MS. KORENBAUM:  May I hand it to Juror No. 1, your
20   Honor?

21           THE COURT:  You may.

22           MS. KORENBAUM:  They can pass it around?

23           THE COURT:  That's fine.

24           MS. KORENBAUM:  Thank you.

25   BY MS. KORENBAUM:

J3C6ACO3                        Callahan - direct

1    Q.  Mr. Callahan, what was your role in the investigation?

2    A.  I was assigned the -- being that it was my confidential

3    informant, I was the lead detective on the investigation.

4    Q.  I want to focus you on the date of April 29th, 1994.

5    A.  Yes, ma'am.

6    Q.  Were you working on this investigation on that day?

7    A.  Yes, I was.

8    Q.  Do you remember what happened -- the details of what

9    happened that day with respect to the investigation?

10   A.  Yes.

11   Q.  Before you tell us that, have you had the opportunity to

12   review your grand jury testimony --

13   A.  Yes.

14   Q.  -- regarding that investigation?

15   A.  Yes.

16   Q.  Did that help to refresh your recollection of three events

17   of 20-something years ago?

18   A.  Yes.

19   Q.  Can you tell us what you remember happening on April 29th,

20   1994?

21   A.  Okay.  I recall being assigned to the observation post on

22   the 29th and at approximately 1320 hours, 1:20 p.m., I observed

23   a vehicle traveling northbound on Amsterdam Avenue get flagged

24   down by Robert Nelson Acosta.  The operator of the vehicle

25   pulled over and parked on the east side of Amsterdam Avenue.

J3C6ACO3                      Callahan - direct

1   The driver of that vehicle, James Warren, exited the vehicle

2   and crossed over to the west side of Amsterdam Avenue.  James

3   Warren proceeded to walk towards Robert and Nelson Acosta.  As

4   he approached, he engaged in conversation, took out United

5   States currency and handed it to Robert Acosta.  Robert Acosta

6   then unfold the that currency, folded it back up and placed it

7   in his pocket at which times James Warren walked back across to

8   the east side of Amsterdam Avenue.

9   Q.  Now, Mr. Callahan, you said you observed three men;

10  correct?

11  A.  Yes, ma'am.

12  Q.  And can you tell us how close you were to them

13  approximately?

14  A.  I was across the street in the observation post, the second

15  floor of -- I believe it was a church.

16  Q.  Did you have a clear view of the three men at that point?

17  A.  Yes, ma'am.

18  Q.  At that point after you made your observations, did you

19  communicate with anyone on the radio?

20  A.  Yes, I did.

21  Q.  Why did you do that?

22  A.  I observed George Patrick enter the location, 500 West

23  149th Street and then exit the location carrying a multicolored

24  sweater with a zipper and hand that to Nelson Acosta at which

25  time I proceeded to place the observations over the radio.

J3C6ACO3                              Callahan - direct

1  Q.  Mr. Callahan, were you involved in obtaining and executing

2  search warrants regarding the spring of 1994 investigation?

3  A.  Yes, ma'am.

4  Q.  Did you swear out a search warrant affidavit in front of a

5  New York state judge in order to obtain those warrants?

6  A.  Yes, I did.

7  Q.  Do you recall what the number of search warrants were that

8  you obtained?

9  A.  I believe it was six.

10 Q.  As you sit here today can you tell us all six locations

11 that you had warrants for?

12 A.  No.

13 Q.  Did you do paperwork in this case?

14 A.  Yes, I did.

15 Q.  Did you -- you testified before that you did a search

16 warrant affidavit?

17 A.  Yes.

18 Q.  Would that perhaps help you to refresh your recollection as

19 to the places that were searched?

20 A.  Yes, ma'am.

21 Q.  Did you also do a police report concerning arrests that

22 were made -- excuse me.

23        MS. KORENBAUM:  I will rephrase that, your Honor.

24 Q.  Did you also seize evidence during the execution of the

25 search warrant?

J3C6ACO3                          Callahan - direct

1    A.  Yes.

2    Q.  And do you recall as you sit here today what you seized?

3    A.  I seized United States currency.

4    Q.  Do you recall approximately how much United States

5    currency?

6    A.  Approximately $10,000.

7    Q.  Do you remember what apartment you seized that money from?

8    A.  No, I don't.

9    Q.  On the -- in front of you there is 352 -- Government

10   Exhibit 3521-03 for identification.  With respect to the

11   locations where the search warrants were executed, I would like

12   you to take a look at that, specifically the first two pages,

13   and then put it aside.

14   A.  Okay.

15   Q.  Now, this question is a little bit long so bear with me.

16        It says, Does reading the first two pages of that

17   search warrant affidavit refresh your recollection about the

18   specific locations for which you obtained search warrants in

19   this investigation, or would you need to read that to the jury

20   in order to convey that information accurately?

21   A.  I would prefer to read that to the jury.

22   Q.  So let me ask you a few questions first before you do that.

23        Were you involved in preparing that search warrant

24   affidavit?

25   A.  Yes, I was.

J3C6ACO3                          Callahan - direct

1    Q.  And was this done when the information contained in the

2    affidavit was still fresh in your mind from your investigation?

3    A.  Yes.

4    Q.  Can you take a look at the last page and tell us if you

5    signed that affidavit?

6    A.  Yes, I did sign it.

7    Q.  Before you did so, did you review the affidavit, including

8    the first three pages, to make sure the information contained

9    in it was accurate?

10   A.  Yes.

11   Q.  Why would you do that?  Why is it important that the

12   information in the affidavit be accurate?

13   A.  Well, for times like today.  When you are at trial

14   testifying, you want to make sure all the information you have

15   is accurate.

16   Q.  Especially in cases that are over 20 years old?

17   A.  Yes.

18   Q.  And do you believe that the information in this affidavit,

19   the one in front of you, including the first two pages, is

20   accurate?

21   A.  Yes, ma'am.

22             MS. KORENBAUM:  Your Honor, the government requests

23   that Mr. Callahan be permitted to read from his affidavit and

24   specifically the information concerning the locations that he

25   was authorized to search, which information is contained on the

1    first two pages of the affidavit.

2              THE COURT:  Any objection?

3              MR. MIEDEL:  No objection.

4              MS. MARCUS:  No objection.

5              THE COURT:  Permitted.

6              Go ahead.

7    BY MS. KORENBAUM:

8    Q.  So, Mr. Callahan, reading from the first two pages of your

9    affidavit, can you tell us for what locations you obtained

10   court authorized search warrants in the spring of 1994?

11   A.  Yes, ma'am.  First search warrant was No. 287 and that was

12   for a 1990 blue Lincoln with New York license plates Victor 9

13   Thomas 180, which would have been parked in the vicinity of 502

14   West 149th Street.

15             The second search warrant was No. 288 and that was for

16   Apartment 3E, a gray door on the fifth floor in this premises

17   500 West 149th Street.

18             The third search warrant was for Apartment 2E in

19   premise 500 West 149th Street.

20   Q.  Thank you.

21   A.  The fourth search warrant, No. 290, was for Apartment 3D on

22   the fourth floor in premise 500 West 149th Street.

23             The fifth search warrant was for Apartment 3A7 in

24   premise 502 West 149th Street.

25             And the last search warrant was for Rob's Hair Plus

J3C6ACO3                          Callahan - direct

1    located at 1812 Amsterdam Avenue.

2    Q.  Thank you, Mr. Callahan.

3           Do you recall which apartment you searched or

4    participated in the search of?

5    A.  No, I don't.

6    Q.  Did you do a property voucher in this case?

7    A.  Yes, I did.

8    Q.  Might that voucher help you to recollect which apartment

9    you searched?

10   A.  Yes.

11   Q.  Do you have that voucher in front of you?  I think it is to

12   your side.

13   A.  Yes.

14          MS. KORENBAUM:  For the record that is Government

15   Exhibit 3521-02 for identification.

16   Q.  Is that voucher then filled out regarding the cash that you

17   previously testified about?

18   A.  Yes, ma'am.

19   Q.  Having reviewed it, does it refresh your recollection as to

20   which location you searched?

21   A.  Yes.

22   Q.  What was that?

23   A.  Okay.  At 500 West 149th Street I removed the United States

24   currency from Nelson Acosta.

25   Q.  Thank you.

J3C6ACO3                              Callahan – direct

1              MS. KORENBAUM:  Your Honor, may I approach?

2              THE COURT:  You may.

3              This is going to be the rule in this trial:  Counsel

4    for all witnesses have a revocable license to approach the

5    witness with a document.  As long as everyone is well behaved

6    as I expect them to be, your license won't be revoked.  You

7    have permission to approach with a document.

8              MS. KORENBAUM:  Thank you.

9              THE COURT:  And then the practice is you return to the

10   podium for the question.

11             Go ahead.

12             The same way if a document is received into evidence,

13   you may publish it to the jury immediately.

14             MS. KORENBAUM:  While Mr. Callahan is looking that the

15   document, can you bring up on his screen only what has been

16   marked for identification as Government Exhibit 701.

17   BY MS. KORENBAUM:

18   Q.  Mr. Callahan, can you tell me if it pops up on your screen.

19   If not, we'll proceed.

20   A.  It popped up on the screen.

21   Q.  Excellent.

22             Do you recognize that location?

23   A.  Yes.

24   Q.  What is it?

25   A.  I believe that's the entrance to 500 West 149th Street.

J3C6ACO3                          Callahan - direct

1   Q.  And is that the building in which the apartment that you

2   searched was located?

3   A.  Yes, ma'am.

4           MS. KORENBAUM:  The government offers 701.

5           THE COURT:  Any objection?

6           MS. MARCUS:  No objection.

7           MR. MIEDEL:  No objection.

8           THE COURT:  Received.

9           (Government's Exhibit 701 received in evidence)

10          MS. KORENBAUM:  Thank you.

11          We can publish that to the jury.

12          Ms. Fetman, can you bring up on Mr. Callahan's screen

13  only what has been marked for identification as Government

14  Exhibit 800.

15  BY MS. KORENBAUM:

16  Q.  Do you have that, Mr. Callahan?

17  A.  Yes, ma'am.

18  Q.  Do you recognize this photograph?

19  A.  Yes.

20  Q.  How do you recognize it?

21  A.  Well, that's a member of my major case team.

22  Q.  The members of your major case team?

23  A.  Yes, ma'am.

24  Q.  And have you seen the photograph before?

25  A.  Yes.

J3C6ACO3                          Callahan - direct

1    Q.  Where was it taken?

2    A.  This was taken back at our office.

3    Q.  When was it taken?

4    A.  Oh, this was taken after the night -- during the night of

5    May the 4th, 1994.

6    Q.  That's the date that the search warrants were executed?

7    A.  Yes, ma'am.

8              MS. KORENBAUM:  The government offers Government

9    Exhibit 800.

10             THE COURT:  Any objection?

11             MS. MARCUS:  No objection.

12             MR. MIEDEL:  No objection.

13             THE COURT:  Received.

14             (Government's Exhibit 800 received in evidence)

15   BY MS. KORENBAUM:

16   Q.  Mr. Callahan, are you in that photograph?

17   A.  Yes, ma'am.

18   Q.  Can you tell us where you are seated or located in the

19   photograph?

20   A.  Okay.  I am kneeling down in the first row.  I am the third

21   person from the left.

22   Q.  What color shirt are you wearing?

23   A.  It's a gray Notre Dame sweatshirt.  It is gray and it has

24   the letters ND on it.  You cannot see it because of the

25   property, but that is what I was wearing.

J3C6ACO3                        Callahan - cross - Koffsky

1    Q.  Mr. Callahan, those are other members of your team in the

2    photograph?

3    A.  Yes, ma'am.

4    Q.  And what is on the table in front of you in that

5    photograph?

6    A.  That's all the property that was seized during the

7    execution of the search warrants.

8    Q.  Can you describe some of that property while you look at

9    it?

10   A.  Yes.  We have the United States currency, which is on the

11   front edge of the table.  We have some of the drug

12   paraphernalia, the scales.  We have the firearms to the left --

13   back level corner of the table.  We have a crossbow --

14   hand-held crossbow, which is right behind the scales.  And then

15   you have the narcotics that were seized in the clear plastic

16   bags in the middle of the table right behind the cash.

17   Q.  Does that photographic accurately depict the items that

18   were seized by your team that day, May 4th, 1994?

19   A.  Yes, ma'am.

20              MS. KORENBAUM:  Nothing further, your Honor.

21              THE COURT:  Cross-examination.

22   CROSS-EXAMINATION

23   BY MR. KOFFSKY:

24   Q.  Good afternoon, Mr. Callahan.

25   A.  Yes, sir.  Good afternoon.

J3C6ACO3                         Callahan - cross - Koffsky

1    Q.  I am looking at that picture that was just up in front of

2    you, Government's 800.

3             You are much younger then?

4    A.  Yes, ma'am.

5    Q.  I see you are wearing glasses now.  It's been 25 years

6    since this incident; correct?

7    A.  Yes, sir.

8    Q.  Do you have documents in front of you right now?

9    A.  There are documents.

10   Q.  If you don't look at those documents.

11   A.  There you go.

12   Q.  On some of the paperwork I have with regard to what you did

13   in 1994, there's a date of an original report.  Off the top of

14   your head, do you remember what the date of the original report

15   is?

16   A.  What report are you referring to?

17   Q.  There's a complaint follow-up that you prepared.  It's a

18   two-page report that talks about some of the things that you

19   observed.  On the top of that document there's a -- it's called

20   Date of Original Report.

21            Do you remember off the top of your head what the date

22   of the original report was?

23   A.  No.

24   Q.  There's a section there that says Date Assigned.

25            Do you recall what the date of the assignment was?

J3C6ACO3                        Callahan - cross - Koffsky

```
 1   A.  No.

 2   Q.  There's a case number.

 3           Do you recall what the case number was?

 4   A.  No.

 5   Q.  There's an indication that there is a complaint number.

 6           Do you recall what the complaint number was?

 7   A.  The complaint number might have been my assigned buy-up

 8   number.  When you are assigned to narcotics, you are assigned a

 9   number that stays with you in narcotics.  So I would say that

10   could have been my complaint number.

11   Q.  I asked some of those questions because --

12           THE COURT:  No.  No.

13           MR. KOFFSKY:  Withdrawn.

14   Q.  Did you have an opportunity to review your reports before

15   testifying today?

16   A.  No.

17   Q.  Did the government give you at any point reports to refresh

18   your recollection with regard to your description of the events

19   from 1994?

20   A.  Just my grand jury testimony.

21   Q.  So at some point the government sent you grand jury

22   testimony with regard to your testimony in this case?

23   A.  The grand jury testimony that I provided in the original

24   grand jury is what I reviewed, correct.

25   Q.  How about the photograph, did you provide that to the
```

J3C6ACO3                          Callahan - cross - Koffsky

1   government as well?

2   A.   Which photograph?

3   Q.   The photograph Government Exhibit 800.

4   A.   Yes.

5   Q.   You provided that?

6   A.   Yes, sir.

7   Q.   Do you still keep your notes relative to your

8   investigations from back in these days?

9   A.   No.

10  Q.   So are you testifying based upon your memory from 25 years

11  ago?

12  A.   I don't understand the question.  Can you reask the

13  question?

14  Q.   Sure.  Let's see.  You've testified -- you testified that

15  you got information from a confidential informant.

16          Do you recall that?

17  A.   Yes.

18  Q.   Now, have you had an opportunity to look at your grand jury

19  testimony leading up to today's testimony?

20  A.   Yes.

21  Q.   Is there anything in your grand jury testimony that talks

22  about confidential informant?

23  A.   No.

24  Q.   So it's your recollection from 25 years ago that this

25  particular investigation started with a CI?

J3C6ACO3                          Callahan – cross – Koffsky

1    A.  Yes.

2    Q.  And that is based upon your review of any records, or is

3    that just your memory from 25 years ago?

4    A.  Well, based on my recommend memory and review of some

5    records.

6    Q.  What records did you review?

7    A.  The search warrant.

8    Q.  Right.  Anything else?

9    A.  That's it.

10   Q.  The search warrant that -- now, was the search warrant put

11   in front of you?

12   A.  Yes, sir.

13   Q.  How many pages is that search warrant?

14   A.  Do you want me to count them?

15   Q.  Yes, please.

16   A.  I think it is 18 of 18.

17   Q.  So there is an 18-page search warrant which outlined what

18   your investigation was 25 years ago; am I correct?

19   A.  Yes, sir.

20   Q.  Prior to testifying today, you had the opportunity to

21   review your grand jury testimony and that 18-page search

22   warrant; correct?

23   A.  Correct.

24            THE COURT:  Ladies and gentlemen, let's stand up and

25   stretch.

J3C6ACO3                          Callahan - cross - Koffsky

1           (Pause)

2           THE COURT:  Be seated.

3   BY MR. KOFFSKY:

4   Q.  Mr. Callahan, back in your days as an investigator and a

5   detective with the major Manhattan north narcotics units, I

6   imagine you did a lot of investigations; correct?

7   A.  Yes, sir.

8   Q.  You did investigations, which used confidential informants

9   which gave you street-level information; correct?

10  A.  Yes.

11  Q.  And you sent undercover officers out to make buys from drug

12  dealers; correct?

13  A.  Correct.

14  Q.  And you sat up in observation locations and you did

15  observation buys; correct?

16  A.  Correct.

17  Q.  And I would imagine -- how many years were you in the

18  Manhattan north narcotics unit?

19  A.  Well, Manhattan north narcotics or the major case unit?

20  Q.  In Manhattan north narcotics?

21  A.  So I got top Manhattan north narcotics I believe in 1992

22  and I believe I transferred out in 1996.

23  Q.  During that time did you make hundreds of arrests?

24  A.  I would say a hundred.

25  Q.  You engaged in dozens, more than -- withdrawn.

J3C6ACO3                         Callahan - cross - Koffsky

1                You engaged in as many search warrants?

2     A.  Possibly.

3     Q.  Would you agree with me that some of your records, your

4     reports like the search warrant that you were given and which

5     you reviewed, that refreshes your recollection; correct?

6     A.  Yes.

7     Q.  Would you agree with me that memories fade?

8     A.  Yes.

9     Q.  You wouldn't have known anything about this case from 25

10    years ago unless the government had given you your search

11    warrant; am I correct?

12    A.  No, that's not correct.

13    Q.  You recall each and every arrest with particularity which

14    would allow you 25 years later to come in and testify in a

15    trial in front of a jury such as this?

16    A.  Rephrase that question again or ask it again, please, so I

17    understand.

18    Q.  May I have -- it may be a little convoluted.

19            MR. KOFFSKY:  May I ask the Court to read it back,

20    your Honor?

21            THE COURT:  No.  Rephrase your question.

22            MR. KOFFSKY:  Okay.

23    Q.  Would it be your testimony that you could recollect all of

24    the arrests that you made while you were in Manhattan narcotics

25    and testify cogently to a jury such as this 25 years later?

J3C6ACO3                         Callahan – cross – Koffsky

1   A.  Possibly not.

2   Q.  Because memories can fade?

3   A.  Memories can fade or depends on the circumstances around

4   the investigation.  Like when you have a nice takedown or you

5   go over, you know, seizures and things that you know of, that

6   sometimes jars your memory and you are ready to talk about.

7   Oh, I remember that case and you can give a synopsis o it.

8   Q.  But memories can also become distorted; right?

9   A.  Sometimes.

10  Q.  And memories can be imperfect; correct?

11  A.  I would agree to that.

12  Q.  And so one of the things you learn early on in your police

13  training at the police academy is how to keep records?

14  A.  Yes, sir.

15  Q.  The first thing you do when you leave the police academy is

16  you have a memo book; right?

17  A.  You have your memo book in your academy.

18  Q.  Right.  One of the things you learn is to put down on paper

19  immediately what you have done, what you have seen, what you

20  have heard so that you remember it because memories fade?

21  A.  Correct.

22  Q.  And particularly in law enforcement, you know that you may

23  not wind up going to talk to a prosecutor or going to a grand

24  jury for weeks; right?

25  A.  Correct.

J3C6ACO3                          Callahan - cross - Ms. Marcus

1   Q.  And you might not go to trial for a year or 18 months;

2   correct?

3   A.  Correct.

4   Q.  And those records that you keep, that's because memories

5   fade?

6   A.  Yeah.

7            MR. KOFFSKY:  Nothing further.

8            Thank you, your Honor.

9            THE COURT:  Any redirect?

10           MS. KORENBAUM:  No, your Honor.

11           THE COURT:  You may step down.

12           THE WITNESS:  Thank you, your Honor.

13           THE COURT:  I am so sorry, Ms. Marcus.  My apology.

14   CROSS-EXAMINATION

15   BY MS. MARCUS:

16   Q.  Good afternoon.

17   A.  Good afternoon.

18   Q.  So you did have a chance to review some of your records in

19   this case?

20   A.  Yes, ma'am.

21   Q.  And you remember that the subject of your investigation was

22   Robert Acosta?

23   A.  Yes, ma'am.

24   Q.  And you remembered some or your memory was refreshed about

25   some other names that were in the records that you reviewed?

J3C6ACO3                         Callahan - cross - Ms. Marcus

1    A.  Yes.

2    Q.  You remembered a Nelson Acosta and a James Warren?

3    A.  Correct.

4    Q.  Nothing in your investigation revealed anything about Jose

5    Diaz; is that correct?

6    A.  That's correct.

7              MS. MARCUS:  Thank you.

8              THE COURT:  Any redirect?

9              MS. KORENBAUM:  No, your Honor.

10             THE COURT:  Now you may step down.

11             THE WITNESS:  Thank you, your Honor.

12             (Witness excused)

13             MR. KROUSE:  The government calls Santos Rivera.

14             THE DEPUTY CLERK:  Step into the witness box and

15   remain standing and raise your right hand.

16    SANTOS RIVERA,

17        called as a witness by the Government,

18        having been duly sworn, testified as follows:

19             THE DEPUTY CLERK:  Please be seated.  State your name

20   and spell it for the record, please.

21             THE WITNESS:  Santos Rivera.  S-a-n-t-o-s.

22   R-i-v-e-r-a.

23             THE COURT:  Mr. Krouse, you may inquire.

24             MR. KROUSE:  Thank you, your Honor.

25   DIRECT EXAMINATION

J3C6ACO3                          Rivera - direct

1   BY MR. KROUSE:

2   Q.  Good afternoon, Mr. Rivera.

3   A.  Good afternoon, sir.

4   Q.  Are you currently employed?

5   A.  No, I am not.  I am retired.

6   Q.  Did you at some point work for the New York City Police

7   Department or the NYPD?

8   A.  Yes, I did.

9   Q.  How many years did you work for the NYPD?

10  A.  I did 20 years in the NYPD.

11  Q.  From approximately when to approximately when?

12  A.  From May of '82 to May of 2004 -- 2002.  Sorry, 2002.

13  Q.  A full 20 years; correct?

14  A.  20 years, yes, sir.

15  Q.  After May 2002 when you retired from the NYPD, did you do

16  any other work after that?

17  A.  Yes, I did.

18  Q.  What kind of work did you do after you left the NYPD?

19  A.  I did some security jobs in the hospital.

20  Q.  Go ahead.

21  A.  Then I was a security manager there in charge of two

22  hospitals.

23  Q.  Around when did you retire for good?

24  A.  I would like to say five or six years ago.

25  Q.  What was your title upon leaving the NYPD?

J3C6ACO3                          Rivera – direct

1   A.  I retired with a title of detective.

2   Q.  Now, if I could direct your attention to the spring of

3   1994, which unit with the NYPD were you assigned to during that

4   time period?

5   A.  I was working with Manhattan north narcotic unit and it was

6   a major case unit.

7   Q.  In the Spring of 1994 were you involved in an investigation

8   into a drug organization based in the location of 149th Street

9   and Amsterdam Avenue in Manhattan?

10  A.  Yes, I was.

11  Q.  Were you with working with other members of the NYPD on

12  that investigation?

13  A.  Yes, I was.

14  Q.  As a result of that investigation, did you and your team

15  search several locations using search warrants?

16  A.  Yes, we did.

17  Q.  As a result of that investigation, did you and other

18  members of your team make a number of arrests?

19  A.  Yes, we did.

20  Q.  Now, directing your attention to a few days before May 4th,

21  1994, directing your attention to April 29th, 1994, were you

22  working on that broader investigation that day?

23  A.  Yes.

24  Q.  Now, recognizing that this was a long time ago, do you

25  remember some of the details about what happened that day?

J3C6ACO3                          Rivera - direct

1    A.   Some.

2    Q.   What details do you remember about that day?

3    A.   I remember that I got a radio transmission from one of my

4    team members and I responded to a location where I stopped the

5    vehicle.  And once I stopped the vehicle, I told the guy in the

6    vehicle to exit the vehicle.  And as he exited the vehicle, he

7    had a brown paper bag in his right hand, which he dropped to

8    the ground.

9    Q.   And what, if anything, did you do with that brown paper

10   bag; do you recall?

11   A.   Yes.  I vouchered the brown paper bag.

12   Q.   Why did you voucher it?

13   A.   Because inside the brown paper bag was two plastic bags,

14   separate bags, with crack cocaine in it.

15   Q.   Do you remember specifically where you were when you made

16   that car stop?

17   A.   155th Street and Saint Nicholas.

18   Q.   That is in Manhattan, New York?

19   A.   Yes.  Manhattan, New York.

20   Q.   Now, at that location you mentioned that you arrested the

21   individual who was driving the vehicle?

22   A.   Yes, I did.

23   Q.   At this time to you remember what that individual's name

24   was?

25   A.   No.  No.

J3C6ACO3                      Rivera - direct

```
 1    Q.  I am going to hand you a document, Mr. Rivera.  It says

 2    3532-01, page 29.

 3          Mr. Rivera, if you could look down at that document,

 4    read it and when you are finished look back up.

 5          Did looking at that document refresh your recollection

 6    as to the person you arrested on that day?

 7    A.  Yes, I do refresh my recollection.

 8    Q.  So if you could put the document aside.

 9          What was the name of the individual you arrested that

10    day?

11    A.  Mr. James Warren.

12    Q.  You mentioned when you arrested Mr. Warren, you also

13    vouchered a bag into evidence?

14    A.  Yes.

15    Q.  Now, sitting here today do you recall exactly what was

16    recovered from the bag, or would you need to look at the

17    voucher to be certain?

18    A.  I uncovered two plastic bags with crack cocaine inside the

19    brown paper bag.

20    Q.  You vouchered that crack cocaine into evidence; correct?

21    A.  Yes.  I put my initials on the bags -- on the bags and the

22    brown paper bags.

23    Q.  Can you tell the jury what vouchering consists of,

24    vouchering evidence?

25    A.  When you voucher evidence for that, there's a form with the
```

J3C6ACO3                              Rivera - direct

1    police department that we use for evidence.  We use this form

2    so if this ever goes to court or anything like that, it is

3    already documented to be, you know, what was there.

4    Q.  In addition to the two clear plastic bags containing crack

5    cocaine, did you voucher anything else into evidence that day?

6    A.  Yes, I did.

7    Q.  Do you recall what else you vouchered into evidence?

8    A.  It was a vehicle.

9    Q.  Now, you mentioned how vouchering works.  Was it your

10   personal practice to be accurate in filling out NYPD property

11   vouchers?

12   A.  Yes.

13   Q.  Why is that?

14   A.  It is important that you write down the right things

15   because maybe in the future this might go to trial or this

16   might be a case.  So, your know, it is important that what I

17   bright down is what happened and what is there that I

18   vouchered.

19   Q.  Do you remember the details of the car that you vouchered

20   sitting here today?

21   A.  No, I don't remember the car.

22   Q.  Would you need to read from the voucher to know for certain

23   what those details were?

24   A.  Yes, please.

25            MR. KROUSE:  Ms. Fetman, if can put on the screen what

J3C6ACO3                          Rivera - direct

1   has been marked as 3532-01 page 39.  Excuse me, 36.

2   Q.  Mr. Rivera, I will also give you a hard copy because I know

3   the screen is difficult to read from.

4   A.  Thank you.

5   Q.  You're welcome.

6          Did you prepare this document, Mr. Rivera?

7   A.  Yes, I did.

8   Q.  How do you know that you prepared it?

9   A.  I have my signature on the bottom.  I have my name on the

10  top, my rank and of course the name of the defendant.

11  Q.  You mentioned that it is your personal practice to be

12  accurate in filling out these kinds of vouchers?

13  A.  Yes.

14  Q.  Do you believe sitting here today that you filled out that

15  voucher accurately?

16  A.  Yes.

17          MR. KOFFSKY:  Your Honor, the government requests that

18  Mr. Rivera be permitted to read from this voucher as a past

19  recollection recorded.

20          THE COURT:  Any objection?

21          MR. KOFFSKY:  No objection, your Honor.

22          THE COURT:  You may proceed.

23  BY MR. KOFFSKY:

24  Q.  Mr. Rivera, what kind of car was seized this day?

25  A.  This was a 1991 Chevy Tracker and the color red.

J3C6ACO3                              Rivera - direct

1   Q.  Where was the car seized?

2   A.  It was seized in the corner of 155th Street and Saint

3   Nicholas Avenue in Manhattan.

4   Q.  Who was the car seized from?  Who did it belong to?

5   A.  It belonged to Mr. James Warren.

6   Q.  Was a reason given for seizing this car?

7   A.  Yes.

8   Q.  What was the reason?

9   A.  Because we found the drugs inside of his possession in the

10  car.  That was the reason we vouchered the car.

11  Q.  If I could direct you to the remarks section.

12  A.  Yes.

13  Q.  If you could read directly what is on the voucher.

14  A.  At time place of occurrence, above listed defendant was

15  driving said vehicle and was in possession in -- in possession

16  of 4 ounces of alleged cocaine.  Vehicle is to be held for

17  forfeiture procedures.

18  Q.  Thank you, Mr. Rivera.

19          Did you also seize a quantity of cash from Mr. Warren?

20  A.  I don't remember.

21  Q.  Sitting here today, do you remember seizing an item -- a

22  quantity of cash from Mr. Warren?

23  A.  Not at this time, no.

24          MR. KROUSE:  Ms. Fetman, if you can put on the screen

25  for the witness 3502-01 page 37.

J3C6ACO3                         Rivera - direct

1            I will approach the witness and hand him a physical

2       copy of that document.

3            THE WITNESS:  Thank you.

4       Q.  Mr. Rivera, what is that document?

5       A.  This is a voucher of the monies he had on him the day of

6       the arrest.

7       Q.  Did you prepare that voucher?

8       A.  Yes, I did.

9       Q.  How do you know?

10      A.  It has my name, my signature, the defendant's name, and my

11      name.

12      Q.  Do you believe that you filled out this voucher accurately?

13      A.  Yes, I do.

14           MR. KROUSE:  Your Honor, the government requests that

15      Mr. Rivera be permitted to read from this voucher as past

16      recollection record.

17           MR. KOFFSKY:  No objection, your Honor.

18           THE COURT:  Proceed.

19      BY MR. KROUSE:

20      Q.  Mr. Rivera, who does this voucher say the quantity of

21      currency was seized from?

22      A.  It was seized from Mr. James Warren.

23      Q.  And what amount was the currency?

24      A.  It was a total of $155.

25      Q.  Moving now to another topic, you testified before that a

1    number of arrests were made in the course of this

2    investigation.

3    A.  Yes.

4    Q.  Were those arrests made about a week later on May 4, 1994?

5    A.  Yes.

6    Q.  Were those arrests on May 4th, 1994, all made in the

7    vicinity of 149th Street and Amsterdam Avenue?

8    A.  Yes, they were.

9    Q.  Do you remember the names of all the people who were

10   arrested on May 4th, 1994, as you sit here today?

11   A.  No, I don't.

12   Q.  At the time of the arrest, did you create paperwork to

13   record those arrests?

14   A.  Yes, I did.

15   Q.  Would seeing that paperwork refresh your recollection as to

16   who was arrested on May 4th, 1994, or would you need to read

17   from those documents in order to accurately convey that

18   information?

19   A.  Yes, sir.

20   Q.  Which is it, would it refresh your recollection or do you

21   need to read it?

22   A.  I need to read it.

23        MR. KROUSE:  Your Honor, the government will approach

24   the witness and hand him a stack of six pages.

25        For the record what the witness was just handed was

J3C6ACO3                         Rivera - direct

1  3532-01 page 2, 3532-01 page 9, 3532-01 page 14, 3532-01 page

2  15, 3532-01 page 21, and 3532-01 page 28.

3  BY MR. KROUSE:

4  Q.  Mr. Rivera, if you can look down at those documents, flip

5  through them and look up when you are finished.

6  A.  Okay.

7  Q.  Is this all paperwork that is created upon an individual's

8  arrest?

9  A.  Yes.

10  Q.  Did you fill out this paperwork on May 4th, 1994?

11  A.  Yes, I did.

12  Q.  Did you fill out these forms accurately?

13  A.  Yes, I did.

14  Q.  Was it your practice to fill out these forms accurately?

15  A.  Yes.

16  Q.  Why is that?

17  A.  It is important that everything you document is being used

18  for, you know -- again for maybe for the courts or maybe

19  forever.  In this case everything has to be documented.  If I

20  give them something back, I document that I gave it to them.

21        MR. KROUSE:  The government requests that Mr. Rivera

22  be permitted to read from these documents as past recollection

23  recorded.

24        MR. KOFFSKY:  No objection, your Honor.

25        THE COURT:  Proceed.

J3C6ACO3                        Rivera – direct

BY MR. KROUSE:

Q.   Looking at that first form in the stack I gave you, whose arrest is recorded on that form?

A.   This arrest was Mr. Willy Ventura.

Q.   Looking at the second form, whose arrest is recorded in the second form?

A.   That is Mr. Nelson Acosta.

Q.   Looking at the third form, whose arrest is recorded on the third form?

A.   This is Mr. George Patrick.

Q.   Looking at the fourth form, whose arrest is recorded on this form?

A.   This one is Mr. Robert Issacs.

Q.   Can you spell Issacs for the record?

A.   I-s-s-a-c-s.

Q.   What is the arrest number listed there for Robert Issacs?

A.   The arrest number is 39032.

Q.   What is an arrest number?

A.   An arrest number is what a defendant will get at the time of getting arrest and that arrest number will be used to say that this is him that got arrested and he is under that arrest number.

Q.   All the paperwork for that particular arrest would have that same arrest number on it?

A.   Yes.

J3C6ACO3                          Rivera - direct

1    Q.  So is it fair to say that that is a unique identifier to a

2    particular arrest?

3    A.  Yes, it is.

4    Q.  Looking at the next sheet, which is a little bit different

5    than that sheet with Robert Issacs name on it, can you describe

6    to the jury what this sheet is?

7    A.  This form we use is a prisoner property envelope

8    coversheet.  With this form what we do is everything that we

9    would remove from him, we write it down here and that's what he

10   is going to get back after, you know, whatever they do in

11   court.  He will get this back.  This is basically personal

12   property.

13   Q.  What is the name listed on that form in front of you?

14   A.  This one is Issacs, Robert and it has another name that he

15   went by and that is Mojica.

16   Q.  So what that is the full name that is listed on that

17   document?

18   A.  It is Mr. Robert Issacs Mojico.

19                 (Continued on next page)

20

21

22

23

24

25

J3C8ACO4                          Rivera - Direct

1    Q.  Can you spell Mojica for the record?

2    A.  M-O-J-I-C-A.

3    Q.  What is the arrest number reflected on that document?

4    A.  The arrest number here is 39032.

5    Q.  That's the same arrest number as the prior document for

6    Robert Isaacs, correct?

7    A.  Yes.

8    Q.  Is it fair to say that Robert Isaacs and Robert Isaacs

9    Mojica are the same person?

10   A.  Yes.

11   Q.  What is the date of birth listed for Robert Isaacs Mojica

12   on that form?

13   A.  The date of birth is 5/26/70.

14   Q.  So May 26, 1970?

15   A.  Yes.

16   Q.  Now, looking at the next form, whose arrest is recorded on

17   that form?

18   A.  This arrest was Mr. Aneudis Almonte.

19   Q.  Can you spell Aneudis Almonte?

20   A.  A-N-E-U-D-I-S.

21   Q.  And the last name?

22   A.  A-L-M-O-N-T-E.

23   Q.  All of these individuals arrested were arrested the same

24   day, May 4, 1994?

25   A.  Yes.

J3C8ACO4                              Rivera - Direct

1    Q.  And from the same area, 149th Street and Amsterdam Avenue?

2    A.  Yes.

3    Q.  What was the listed address for Aneudis Almonte?

4    A.  His listed address was 502 West 149th Street.

5    Q.  Is there an apartment number?

6    A.  Apartment number 4A7.

7    Q.  What is Almonte's date of birth?

8    A.  His date of birth is 12/9/1978.

9    Q.  So December 9, 1978?

10   A.  Yes.

11            MR. KROUSE:  Ms. Fetman, can you put on the screen

12   what has been marked as Government Exhibit 801.

13   Q.  Do you see the document that's now on the screen?

14   A.  Yes.

15   Q.  Do you recognize this document?

16   A.  Yes, I do.

17   Q.  What is it?

18   A.  These are IDs that I removed from Mr. Almonte, two IDs he

19   had.  And I also had an ID from his mother.

20   Q.  Go ahead.

21   A.  And what I did was I made copies of it, and of the mother,

22   so it can be kept in the file to show that we have that, and he

23   is going to get that back.

24   Q.  Why did you make a copy of his mother's identification?

25   A.  I believe that the mother is the mother and they might turn

J3C8ACO4                          Rivera - Direct

1    the child over to her.

2    Q.  Was it because Mr. Almonte was a minor at the time?

3    A.  Yes.

4              MR. KROUSE:  The government offers Government Exhibit

5    801.

6              MR. KOFFSKY:  No objection.

7              THE COURT:  Received.

8              (Government's Exhibit 801 received in evidence)

9    Q.  Mr. Rivera, at the time of the arrests on May 4, 1994, did

10   you also seize evidence from Robert Mojica Isaacs and Nelson

11   Acosta?

12   A.  I have to see the paperwork.

13             MR. KROUSE:  Ms. Fetman, if you can put on the screen

14   3532-01, page 7.

15             I will approach the witness and hand the witness a

16   hard copy of this document.

17   A.  Thank you.

18             Yes, I did.  I vouchered these.

19   Q.  Did you fill out that voucher personally?

20   A.  Yes, I did.

21   Q.  How do you know that?

22   A.  Pardon me?

23   Q.  How do you know that?

24   A.  Because it has my signature, my name printed on it.  It has

25   the defendant's name on it.

J3C8ACO4                          Rivera - Direct

1    Q.  At the time you filled out this voucher, did you do so

2    accurately?

3    A.  Yes.

4    Q.  Did you do so close in time to the time when you actually

5    seized the evidence?

6    A.  Yes.

7            MR. KROUSE:  The government requests that Mr. Rivera

8    be permitted to read from this document.

9            MR. KOFFSKY:  No objection.

10            THE COURT:  Proceed.

11   A.  Item number 1 is a white Motorola beeper.  And that was

12   taken from Mr. Robert Isaacs Mojica.

13   Q.  Just to be clear, the first item seized from Robert Isaacs

14   Mojica is what?

15   A.  It's a white Motorola beeper.

16   Q.  Then who was the second item seized from?

17   A.  The second item was seized by Nelson Acosta.

18   Q.  Seized by or seized from?

19   A.  Seized from.  I'm sorry.

20   Q.  The second item was seized from whom?

21   A.  Nelson Acosta.

22   Q.  What was that second item?

23   A.  That second item was a black ES communication beeper.

24   Q.  Now, looking at this voucher, do you have the names of the

25   two individuals whose property were seized listed on the

J3C8ACO4                        Rivera - Direct

1    voucher?

2    A.   Yes.

3    Q.   Directing your attention to the top of the voucher, where

4    you list the name Robert Mojica Isaacs.

5    A.   Right.

6    Q.   Did you also know Mr. Mojica Isaacs under a different last

7    name?

8    A.   Yes, I did.

9    Q.   What was that different last name that's recorded on this

10   document?

11   A.   That would be Acosta.

12   Q.   So Robert Acosta, correct?

13   A.   Yes, Robert Acosta.  Yes.

14           MR. KROUSE:   Ms. Fetman, can you put on the screen for

15   everyone what has been admitted into evidence as Government

16   Exhibit 800.

17   Q.   Mr. Rivera, do you recognize this photograph?

18   A.   Yes, I do.

19   Q.   What is it?

20   A.   This is a photograph of all the stuff that we vouchered

21   that we seized.

22   Q.   Who are the other people who are in the photograph?

23   A.   Myself, I'm right here.

24   Q.   Can you describe where?

25   A.   I am to the right standing up, and below me is the other

J3C8ACO4                        Rivera - Direct

1    officer that I know.

2    Q.  Do you have a certain facial expression?

3    A.  Yes.

4    Q.  What is your facial expression in the photo?

5    A.  I'm smiling.

6    Q.  In addition to these other people who are in the

7    photograph, what is on the table?

8    A.  You have some guns, you have some cash, a lot of money, you

9    have, I believe, about four triple beam scales.

10   Q.  You mentioned triple beam scales.  Where in that photograph

11   are the triple beam scales?

12   A.  They are to the right.

13   Q.  You say there is around four of them?

14   A.  Yes.

15   Q.  What is a triple beam scale?

16   A.  They use that to weigh the cocaine, or whatever drugs they

17   are going to sell; they weigh it with these triple beam scales.

18   Q.  When you say "they," who do you mean?

19   A.  The defendants.

20   Q.  Is it fair to say that these items that are on the table in

21   front of you and members of your team, these were items that

22   were seized that day, May 4, 1994?

23   A.  Yes.

24   Q.  And seized from the apartment in the vicinity of 149th

25   Street and Amsterdam Avenue?

J3C8ACO4                          Rivera - Cross

1   A.  Yes.

2              MR. KROUSE:  Can I have one moment, your Honor?

3              THE COURT:  You may.

4              MR. KROUSE:  No further questions.  Thank you.

5              THE COURT:  Cross-examination.

6              MR. KOFFSKY:  Just briefly, your Honor.

7   CROSS-EXAMINATION

8   BY MR. KOFFSKY:

9   Q.  Good afternoon, Mr. Rivera.

10  A.  Good afternoon, sir.

11  Q.  I just want to follow up on one or two things that you

12  said.

13              Based upon some questions from the government lawyer,

14  you indicated that everything needs to be documented?

15  A.  Yes.

16  Q.  Do you remember saying that?

17  A.  Yes.

18  Q.  Then you said that it needs to be accurate and close in

19  time?

20  A.  Yes.

21  Q.  Do you remember saying that?

22  A.  Yes.

23  Q.  Was it your practice to put down in writing as soon as you

24  possibly could the information that you needed to record?

25  A.  Within the time limit that we had, we documented it once we

J3C8ACO4                          Rivera - Cross

1     come in, yes.

2     Q.  So before you left for the day, you needed to fill out your

3     paperwork?

4     A.  Right.

5     Q.  You couldn't come back a week later?

6     A.  No.

7     Q.  You couldn't come back a month later?

8     A.  No.

9     Q.  Because your memory might not be as good a month later?

10    A.  Yes.

11    Q.  If you came back a year later, your memory might be

12    horrible, am I correct?

13    A.  Yes.

14    Q.  You might confuse one person for another?

15    A.  Confuse them, I don't know, because I don't know -- at this

16    time, you know, it was 25 years ago.

17    Q.  Would you imagine just you, your memory might be terrible a

18    year after the fact, am I correct?

19    A.  Not terrible.  I won't remember certain things, but yes.

20    Q.  In this case, did the government give you paperwork to look

21    over prior to testifying?

22    A.  Yes.

23    Q.  What did they give you?

24    A.  They gave me vouchers and the prisoner envelope forms, the

25    vehicle voucher, the central booking sheets.

J3C8ACO4                         Rivera - Cross

1    Q.  How long ago did they give that to you?

2    A.  I would say, I got here Sunday, so Monday.

3    Q.  So Monday they gave you the paperwork.  Did they give you

4    copies and you have had it to review between then and now?

5    A.  Yes.  We went over the paperwork, yes.

6    Q.  You have had telephone conversations with the government as

7    well?

8    A.  Yes.

9    Q.  At which point you have been able to go over your

10   testimony, correct?

11   A.  In the telephone conversations?

12   Q.  Yes.

13   A.  I believe so.

14   Q.  So you have had an opportunity to sort of refresh your

15   recollection?

16   A.  Yes.

17   Q.  Correct?

18        I have to imagine 25 years later, there is stuff that

19   you just don't recall, isn't that correct?

20   A.  That is correct.

21   Q.  Would you say it was 10 percent or 95 percent of this case?

22   A.  It was a lot because of the time factor.

23   Q.  The time factor?

24   A.  Being 25 years.

25   Q.  Right.  I have got to imagine --

1          THE COURT:  Stop imagining.  Ask a question, please.

2     Q.  Is your testimony really based upon the material that the

3     government put in front of you?

4     A.  Yes.

5     Q.  Thank you.

6          MR. KOFFSKY:  Nothing further, your Honor.

7          THE COURT:  Mr. Miedel.

8     CROSS-EXAMINATION

9     BY MR. MIEDEL:

10    Q.  Good afternoon, Mr. Rivera.

11    A.  Good afternoon, sir.

12         MR. MIEDEL:  Can we put Exhibit 800 on the screen

13    again.

14    Q.  Mr. Rivera, that's the picture of the team right after the

15    seizures were made?

16    A.  Yes.

17    Q.  You pointed out that you were in this picture, correct?

18    A.  Yes.

19    Q.  And that you were smiling, right?

20    A.  Yes.

21    Q.  And you're not the only one in this picture smiling, right?

22    A.  No.  A few of us are, yes.

23    Q.  The reason you're smiling is because you're happy to have

24    made this arrest or this seizure, correct?

25    A.  That's one reason, yeah.  And we were happy that we got a

1    nice seizure.

2    Q.  Sure.  Making arrests and making seizures like that, was

3    that one of the factors that were considered in whether people

4    were promoted within the New York police department?

5            MR. KROUSE:  Objection.  Relevance.

6            THE COURT:  Sustained.

7    Q.  Mr. Rivera, nothing in your testimony today has anything to

8    do with Jose Diaz, right?

9    A.  Jose Diaz?

10   Q.  Right.

11   A.  No, I don't have nothing.

12           MR. MIEDEL:  Thank you.

13           THE COURT:  Any redirect?

14           MR. KROUSE:  Just one, your Honor.

15   REDIRECT EXAMINATION

16   BY MR. KROUSE:

17   Q.  Mr. Rivera, Mr. Koffsky asked you a question during his

18   cross-examination, he asked if your testimony was based on the

19   paperwork you had in front of you.  Do you remember that

20   question?

21   A.  Yes.

22   Q.  In your testimony, you stated that all of the paperwork

23   that you have in front of you is paperwork that you yourself

24   filled out in 1994, is that accurate?

25   A.  Yes, that's accurate.

1          MR. KROUSE:  No further questions, your Honor.

2          THE COURT:  You may step down.

3          (Witness excused)

4          THE COURT:  Ladies and gentlemen, let's take our

5   mid-afternoon break.  Please do not discuss the case among

6   yourselves or with anyone.  Please keep an open mind.  We will

7   be back in ten minutes.  Thank you.

8          (Jury exits courtroom)

9          THE COURT:  See you in ten minutes.

10          (Recess)

11          (Jury present)

12          THE COURT:  Please be seated.

13          Call your next witness, please.

14          MS. KORENBAUM:  Yes, your Honor.  The government calls

15   John Galasso.

16   JOHN GALASSO,

17       called as a witness by the government,

18       having been duly sworn, testified as follows:

19          THE DEPUTY CLERK:  State your name and spell it for

20   the record, please.

21          THE WITNESS:  John Galasso, G-A-L-A-S-S-O.

22          THE COURT:  You may inquire.

23   DIRECT EXAMINATION

24   BY MS. KORENBAUM:

25   Q.  Good afternoon, Mr. Galasso.

1    A.  Good afternoon.

2    Q.  Are you currently employed?

3    A.  Yes.

4    Q.  Where do you work?

5    A.  I work for my own company, a security company.

6    Q.  Did you ever work for the New York City Police Department?

7    A.  Yes, I did.

8    Q.  For what years did you work for the NYPD?

9    A.  July 1996 to July 2006.

10   Q.  Did you retire from the NYPD at that time?

11   A.  Yes, I did.

12   Q.  What was your title upon retiring from the NYPD?

13   A.  I was a detective sergeant.

14   Q.  I would like to focus you on the spring of 1994.

15        At that time, what unit within NYPD were you assigned

16   to?

17   A.  Manhattan North Narcotics division, major case unit.

18   Q.  In the spring of 1994, were you involved in an

19   investigation of a drug organization located in the vicinity of

20   149th Street and Amsterdam Avenue?

21   A.  Yes.

22   Q.  Were you working with other members of the NYPD as a team

23   on that investigation?

24   A.  Yes.

25   Q.  Mr. Galasso, what was your role in that investigation?

J3C8ACO4                          Galasso - Direct

1   A.  I executed a search warrant.

2   Q.  Do you remember the address of the location where you

3   executed that warrant?

4   A.  It was 500 West 149th Street.

5        MS. KORENBAUM:  Ms. Fetman, can you put up what is in

6   evidence as Government Exhibit 701.

7   Q.  Mr. Galasso, you see the screen in front of you?

8   A.  Yes.

9   Q.  Do you recognize what is depicted there?

10  A.  It looks like the front entrance of 500 West 149th.

11  Q.  Where you executed the search warrant?

12  A.  Yes.

13  Q.  Did your team execute one or more than one search warrant

14  with respect to this investigation?

15  A.  More than one.

16  Q.  Were you involved in searching one location or more than

17  one location?

18  A.  Just one apartment.

19  Q.  Do you remember if you were alone or with other law

20  enforcement officers when you conducted this search?

21  A.  I had other members of the department with me.

22  Q.  Do you remember the date when the search warrants were

23  executed?

24  A.  It was May 4, 1994.

25  Q.  Did you seize any property as a result of executing that

1   search warrant?

2   A.  Yes, I did.

3   Q.  As you sit here today, do you remember all of the property

4   that you seized that day?

5   A.  No.

6   Q.  Did you prepare any paperwork memorializing the items you

7   seized that day?

8   A.  Yes.

9   Q.  Would that paperwork perhaps refresh your recollection

10  about the property you seized that day?

11  A.  Yes.

12  Q.  Mr. Galasso, to your right there are three pieces of paper

13  marked Government Exhibit 35116-03, 5 of 8; 35116-03, 6 of 8;

14  and 35116-01, 4 of 8.  Do you see those?

15  A.  Yes.

16  Q.  Can you take a look at them and then put them aside and

17  tell me when you have finished reviewing them.

18  A.  OK.

19  Q.  First of all, Mr. Galasso, is your signature and NYPD

20  shield number on all three of those documents?

21  A.  Yes.

22  Q.  I have a rather long question and I will pose it to you

23  slowly.

24          Having read those vouchers, do they refresh your

25  recollection regarding each and every item you seized and

1  vouchered as a result of the search, or would you need to read

2  from those documents in order to convey that information

3  accurately and completely to the jury?

4  A.  I would have to read from them.

5  Q.  Just so that we are clear, those documents consist of two

6  vouchers and a report that you made concerning this

7  investigation?

8  A.  Yes, it does.

9  Q.  And what you have just said applies to your report as well?

10 A.  Yes.

11 Q.  So let me ask you a few questions first.

12       Can you tell the jury what is an evidence voucher and

13 why you prepare them?

14 A.  An evidence voucher is when the police take into custody

15 some property, and we inventory it, we itemize it, for court

16 purposes, for chain of custody reasons.

17 Q.  How many vouchers would you estimate you prepared and

18 filled out during your years with NYPD?

19 A.  Many hundreds.

20 Q.  Can you tell the jurors what a DD-5 is?

21 A.  A DD-5 is a complaint follow-up.  It gives you all the

22 information on the arrest, the name of the perpetrators and

23 some details of the arrest, the time, date, location.

24 Q.  It's a police report, is that right?

25 A.  Yes, a police report.

J3C8ACO4                        Galasso - Direct

1   Q.   How many DD-5s would you estimate you prepared during your

2   career with the NYPD?

3   A.   Hundreds.

4   Q.   Did you prepare those vouchers that are in front of you and

5   the DD-5 that is in front of you close in time to executing the

6   search warrant you're testifying about?

7   A.   Yes, I did.

8   Q.   During your career with NYPD, was it important that you

9   prepare your paperwork, including evidence vouchers and DD-5s,

10  accurately?

11  A.   Yes.

12  Q.   Why is that, Mr. Galasso?

13  A.   Just for reasons like today, for court testimony, I want to

14  be as accurate as possible.

15  Q.   Was it your practice to be accurate in preparing your

16  paperwork, including evidence vouchers and DD-5s?

17  A.   Yes.

18  Q.   Do you believe you prepared those two vouchers and that

19  DD-5 in front of you accurately?

20  A.   Yes.

21          MS. KORENBAUM:  Your Honor, the government requests

22  that Mr. Galasso be permitted to read from his vouchers and

23  DD-5 as his past recollection recorded.

24          MR. KOFFSKY:  No objection.

25          THE COURT:  Proceed.

J3C8ACO4                          Galasso – Direct

1    Q.  Now, starting with Government Exhibit 3503, 6 of 8, which

2    is voucher number -- tell us what voucher number that is.

3    A.  That's F456405.

4    Q.  Can you tell us what items are listed on the voucher?

5    A.  A Ruger model 10/22 Carbine.  It's a .22 LR caliber.  I put

6    a serial number E8559.

7    Q.  Is that a firearm?

8    A.  Yes.  It's a sawed off rifle.

9    Q.  And the next item?

10   A.  A Ram-Line ammo clip.

11   Q.  What is an ammo clip?

12   A.  It's a magazine that goes into the gun, holds the

13   ammunition.

14   Q.  Was that with the Ruger?

15   A.  Yes.

16   Q.  What is the next item?

17   A.  .22 caliber rounds, 22 of them.

18   Q.  You can go on.

19   A.  There was 26 .22 caliber rounds.  And there was four 30

20   carbine rounds.  It looks like one -- looks like a 9 millimeter

21   round.

22   Q.  What are rounds, what do they refer to?

23   A.  They are the bullets.

24   Q.  So this is a voucher for a firearm and associated items?

25   A.  Yes.

J3C8ACO4                          Galasso - Direct

1   Q.  Does it indicate on this voucher the apartment number that

2   you searched within 500 West 149th Street?

3   A.  Yes, it does.

4   Q.  Can you tell us what that is, please?

5   A.  E2.

6   Q.  Now, Mr. Galasso, to your left there is a plastic bag.  Do

7   you see it?

8   A.  Yes.

9   Q.  It contains three items within it.  Don't hold it up yet.

10  If you could just look at it yourself.

11          Have you reviewed these items earlier today?

12  A.  Yes, I did.

13  Q.  Is there a voucher number on the outside of that plastic

14  envelope?

15  A.  Yes, there is.

16  Q.  Does that voucher number match one of the vouchers that you

17  just testified about?

18  A.  Yes.

19  Q.  Do the items listed on that voucher -- can you tell us what

20  voucher it is, please?

21  A.  F456404.

22  Q.  Can you tell us what items are listed on that voucher?

23  A.  One plastic container with white powder, initial JG.

24          One orange and white plastic strainer, initial JG.

25          One manual for HK USP pistol, initial JG.

J3C8ACO4                        Galasso - Direct

1    Q.  JG indicates yourself?

2    A.  Yes, my initials.

3    Q.  Now, can you look at the items within the plastic bag.

4            Do they appear to match what is on the voucher that

5    you just read from?

6    A.  The strainer does; it has my initials.

7            The pistol manual has my initials on it.

8            And the white powder also has my initials on it.

9    Q.  Your initials on those items indicate that they are items

10   that you seized?

11   A.  Yes.

12           MS. KORENBAUM:  The government offers Government

13   Exhibit 802A, 802B and 803C?

14           THE COURT:  Any objection?

15           MR. KOFFSKY:  No objection, your Honor.

16           THE COURT:  Received.

17           (Government's Exhibits 802A, 802B and 803C received in

18   evidence)

19   Q.  Now, starting with 802A, can you just hold that up so the

20   jurors can see it, please, and describe what that is.

21   A.  This is a strainer, plastic strainer.

22   Q.  Now, how many narcotics cases did you work during your

23   career with the NYPD?

24   A.  Hundreds.

25   Q.  That strainer, did you see an item like that during other

1   searches and executing other search warrants at narcotics

2   locations?

3   A.  Yes.  It's very common.

4   Q.  Based on your experience, what is it used for?

5   A.  It's used to strain the cocaine.  Sometimes cocaine may

6   come in a little chunky form and it makes it more powder form.

7   Q.  Now, moving on to Government Exhibit 802B.  Tell us again

8   what that is.

9   A.  This is an operator's manual for HK USP pistol, 9

10  millimeter.

11  Q.  Can you just hold it up so the jury can have a look at it.

12          Now, going on to 802C.  Can you tell us what that is?

13  A.  It's a jar of 100 percent pure lactose.

14  Q.  With respect to narcotics organizations, what is lactose

15  used for in your experience?

16  A.  Lactose is used as a cutting agent to mix in with the

17  cocaine.

18  Q.  Does that make the cocaine a larger quantity?

19  A.  Yes.  You will get two grams of cocaine, you put a gram of

20  this, and now you got three grams and it increases the profits

21  for the drug dealers.

22  Q.  When you executed the search warrant on May 4, 1994, were

23  there any people inside the apartment?

24  A.  Yes, there were.

25  Q.  Do you recall generally who was in there?

J3C8ACO4                          Galasso - Direct

1    A.   It was about six people all together, a couple of children.

2    Q.   Some adults and some children?

3    A.   Yes.

4    Q.   Did you arrest any of the occupants of that apartment?

5    A.   Three adults.

6    Q.   Do you recall the names of the persons you arrested that

7    day?

8    A.   No.

9    Q.   Are those names recorded in your DD-5?

10   A.   Yes, they are.

11   Q.   Can you read those names from the DD-5, just the adults,

12   not the children?

13   A.   Tracy Catlett, JC Hawkins, and Darryl Goddard.

14        MS. KORENBAUM:  Ms. Fetman, can you put on the screen

15   what is in evidence as Government Exhibit 800.

16   Q.   Do you see that photograph on your screen?

17   A.   Yes.

18   Q.   Do you recognize that photograph?

19   A.   Yes.

20   Q.   Have you seen it before?

21   A.   Yes.

22   Q.   Are you in the photograph?

23   A.   Yes, I am.

24   Q.   Can you sort of guide us to where you are in that

25   photograph?

J3C8ACO4                          Galasso - Direct

1   A.  I am in the last row standing up, second from the left.

2   Q.  Is that you?

3   A.  No.

4   Q.  That's not the last row, I don't think.

5   A.  No.  That's it.

6   Q.  Is that you?

7   A.  Yes.

8          THE COURT:  So when you say the left, facing the

9   camera; is that what you meant?

10         THE WITNESS:  That's correct.

11         THE COURT:  Thank you very much.

12  Q.  Do you recognize the other people in this photograph?

13  A.  Yes, I do.

14  Q.  Who are they, generally speaking?  You don't have to name

15  them all.

16  A.  They are members of my unit that executed the warrants that

17  day.

18  Q.  Do you know when the photograph was taken?

19  A.  I believe the same night, May 4, 1994.

20  Q.  What is on the table there in the front part of the

21  picture?

22  A.  It's the evidence seized during the execution of the

23  warrants.

24  Q.  Can you just tell us some of the items in that photograph?

25  A.  Cash, guns, drugs, and paraphernalia, drug paraphernalia.

J3C8ACO4                          Galasso - Cross

1              MS. KORENBAUM:  One moment, your Honor.

2              Nothing further, your Honor.

3              THE COURT:  Cross-examination.

4              MR. KOFFSKY:  Again, just briefly, your Honor.

5     CROSS-EXAMINATION

6     BY MR. KOFFSKY:

7     Q.  Mr. Galasso, you said you retired as a detective sergeant?

8     A.  That's correct.

9     Q.  So at first you were just a regular patrolman, correct?

10    A.  Yes.

11    Q.  Then you became a detective, correct?

12    A.  I became a sergeant.

13    Q.  First you became a sergeant?

14    A.  Right.

15    Q.  Then you became a detective sergeant, which meant that you

16    were the supervising officer at a detective squad, correct?

17    A.  That's correct.

18    Q.  I have to imagine, as a supervising officer at a detective

19    squad, you made sure that the detectives under you did what

20    they were supposed to do, correct?

21    A.  That's correct.

22    Q.  And I think you said, in response to some of the questions

23    to the government, you talked about some of the paperwork that

24    you had and some of the paperwork that you created, and you

25    said two things, that you made sure for you that they were done

J3C8ACO4                          Galasso - Cross

```
1    close in time and that they were done accurately.  Am I
2    correct, was that your testimony?
3    A.  Yes.  For myself personally, that's correct.
4    Q.  Did you also make sure that the detectives in your squad
5    did the same thing?
6    A.  At the time of this arrest, I was a police officer.  I
7    wasn't a detective sergeant.  I got promoted after this.
8    Q.  But would you agree with me that your sergeant or your
9    lieutenant or your captain would require you to make paperwork
10   in time and accurately, correct?
11   A.  That's correct.
12   Q.  What is the reason for that?
13   A.  Chain of custody reasons and it has to be done on time for
14   court proceedings.  You have to take the person down to central
15   booking, talk to the ADA, all the paperwork has got to be done.
16   Q.  And you knew that you might be called to a grand jury, that
17   that might happen in a couple of days, right?
18   A.  Right.
19   Q.  You might be called to hearings and that might be months in
20   advance?
21   A.  Sure.
22   Q.  And you might have a trial that might be a year or 18
23   months down the road, am I correct?
24   A.  That's correct.
25   Q.  This was all to make sure your memory was correct when it
```

J3C8ACO4                          Galasso - Cross

```
 1   got to you testifying a year down the road, or two years down
 2   the road, or 25 years down the road, you wanted to be able to
 3   look at a document to make sure you remembered what happened,
 4   am I correct?
 5   A.   That's correct.
 6   Q.   You wouldn't have wanted to testify a year down the road
 7   without having completed the proper paperwork, would you?
 8   A.   No.
 9   Q.   You testified that you have done hundreds of cases,
10   correct?
11   A.   That's correct.
12   Q.   And filled out thousands of paperwork, thousands of
13   documents, am I correct?
14   A.   Hundreds, thousands, sure.
15   Q.   Because you know that memory is faulty?
16   A.   Yes.
17   Q.   Memory can fade?
18   A.   After 25 years, sure.
19          MR. KOFFSKY:   Thank you.   Nothing further, your Honor.
20          THE COURT:   Cross-examination.
21   CROSS-EXAMINATION
22   BY MS. MARCUS:
23   Q.   Good afternoon.
24   A.   Good afternoon.
25   Q.   So you mentioned some names that were involved in this
```

J3C8ACO4                         McAllister – Direct

1    investigation.  Mr. Tracy Catlett?

2    A.  C-A-T-L-E-T-T.

3    Q.  And a Mr. Goddard?

4    A.  That's correct.

5    Q.  And Mr. Hawkins?

6    A.  Yes.

7    Q.  And nothing in your investigation related to Mr. Jose Diaz,

8    is that correct?

9    A.  I don't have him listed, no.

10           MS. MARCUS:  Thank you.

11           THE COURT:  Any redirect?

12           MS. KORENBAUM:  Nothing, your Honor.

13           THE COURT:  You may step down.  Thank you.

14           (Witness excused)

15           THE COURT:  Call your next witness.

16           MR. KROUSE:  The government calls Patrick McAllister.

17    PATRICK McALLISTER,

18        called as a witness by the government,

19        having been duly sworn, testified as follows:

20           THE DEPUTY CLERK:  State your name and spell it for

21    the record.

22           THE WITNESS:  Patrick McAllister, M-C-A-L-L-I-S-T-E-R.

23    DIRECT EXAMINATION

24    BY MR. KROUSE:

25    Q.  Good afternoon, Mr. McAllister.

1    A.   Good afternoon.

2    Q.   Where do you currently work?

3    A.   I work for a company called K2 Intelligence.

4    Q.   What is K2 Intelligence?

5    A.   It's a company, we do a litany of things, private

6    investigations, AML, which is money laundering, and we do a lot

7    of construction integrity monitoring.

8    Q.   What exactly do you do for K2 Intelligence?

9    A.   I am a principal investigator for them.

10   Q.   How long have you been there, approximately?

11   A.   Approximately six years.

12   Q.   Did you ever work for the NYPD before you worked for K2

13   Intelligence?

14   A.   Yes, I did.

15   Q.   What years did you work for the NYPD?

16   A.   January 1985 to 2005.

17   Q.   Did you retire from the NYPD in 2005?

18   A.   Yes, I did.

19   Q.   What was your title upon retiring?

20   A.   Detective.

21   Q.   If I could direct your attention to the spring of 1994,

22   which unit within the NYPD were you assigned to at that time?

23   A.   OCCB.

24   Q.   Could you tell the jury what that means?

25   A.   That was the narcotics division of the NYPD.

J3C8ACO4                          McAllister - Direct

1    Q.   What geographic area did you focus on?

2    A.   Basically, we worked up in Washington Heights and up in

3    Harlem.

4    Q.   In the spring of 1994, were you involved in an

5    investigation into a drug organization located in the vicinity

6    of 149th Street and Amsterdam Avenue?

7    A.   Yes, I was.

8    Q.   Were you working with other members in the NYPD as a team

9    on that investigation?

10   A.   Yes, I was.

11   Q.   What was your role in that investigation?

12   A.   I was requested to execute a search warrant at a location

13   on 149th Street.

14   Q.   Did the overall team execute one or more than one search

15   warrant on that day?

16   A.   I believe there were numerous search warrants being

17   conducted that day.

18   Q.   Were you involved in just searching one location or more

19   than one location?

20   A.   Just one location.

21   Q.   Do you remember if you were alone or with other law

22   enforcement officers when you searched that one location?

23   A.   I would be with more than one person.

24   Q.   Do you remember the general location of where that search

25   warrant was executed?

J3C8ACO4                      McAllister - Direct

1   A.  West 149th Street, that's about it.

2   Q.  Did you seize any property as a result of executing that

3   search warrant?

4   A.  Yes, I did.

5   Q.  As you sit here today, do you remember all of the property

6   that you seized that day?

7   A.  No, I do not.

8   Q.  Did you do any paperwork memorializing the events of that

9   day and the items that you searched?

10  A.  That is correct.  After executing the warrant, paperwork is

11  completed in the normal course of business, either right after

12  or shortly thereafter the execution of the warrant.

13  Q.  What kind of paperwork is filled out?

14  A.  Immediately you would do vouchers, which anything you

15  recovered and was taken from the apartment would be vouchered

16  and put into envelopes or sealed up.

17  Q.  And after doing the vouchers what other kind of paperwork

18  would you fill out?

19  A.  You would do a complaint report or a DD-5 later on.

20  Q.  What kind of information would be in the complaint report

21  or DD-5?

22  A.  Property that was seized or if anybody was arrested at the

23  time of the execution of the search warrant.

24  Q.  And the location of the search warrant?

25  A.  That would be correct.

1          MR. KROUSE:  I am approaching the witness and handing

2    him a stack of documents.

3    Q.  Mr. McAllister, could you look at those documents, each of

4    them, and then look up when you're done.

5          MR. KROUSE:  For the record, the government handed the

6    witness 3525-01, 3525-02, and 3525-03.

7    Q.  Without going into the substance, what are those documents?

8    A.  Vouchers and a DD-5 and a complaint report.

9    Q.  These are documents that were created shortly after the

10   arrest on May 4, 1994?

11   A.  That is correct.

12   Q.  Is your signature and tax ID number on all of those

13   documents?

14   A.  Yes.

15   Q.  What does that indicate?

16   A.  That I was the one who prepared all these reports.

17   Q.  Having looked at these documents, do they refresh your

18   recollection or would you need to read from them to be exact

19   about what exactly you seized?

20   A.  No.  I would definitely have to read from them.

21         MR. KROUSE:  Your Honor, the government moves to allow

22   the witness to read from these documents as a past recollection

23   recorded.

24         MR. KOFFSKY:  No objection.

25         THE COURT:  Proceed.

J3C8ACO4                          McAllister - Direct

1    Q.  If I could direct you to the first report in that stack I

2    handed you, what is that document?

3    A.  That is a DD-5.

4    Q.  Which is also known as a complaint report?

5    A.  The complaint report is actually 01 -- I'm sorry, 01,

6    Exhibit 01, I guess, is the complaint report, and 02 is the

7    DD-5.

8    Q.  3525-01 is the complaint report and 3525-02 is the DD-5?

9    A.  That is correct.

10   Q.  Looking at that document, what was the location that you

11   were responsible for searching on May 4, 1994?

12   A.  It would be 502 West 149th Street, apartment 3A7.

13   Q.  Is the date of the search and time of the search also

14   memorialized on this report?

15   A.  Yes, it is.  It's May 4, 1994, at 1:50 p.m.

16   Q.  Now, does the DD-5 reflect sort of the same information as

17   what is on 3525-01?

18   A.  Partially.

19   Q.  What is the additional information that the DD-5 adds?

20   A.  DD-5 explains that the weapons recovered from the apartment

21   were sent out to ballistics unit and crime scene for latent

22   prints.

23   Q.  Moving then after the DD-5 to the series of vouchers that's

24   in that stack of documents, these vouchers were also completed

25   by you, correct?

J3C8ACO4                         McAllister - Direct

1   A.  That is correct.

2   Q.  Starting on 3525-03, page 6 of 6, what is the voucher

3   number on that document?

4   A.  That would be Frank 456412.

5   Q.  Go to page 6 of 6, not 5 of 6.

6   A.  Oh, 6 of 6.  OK.  The voucher number would be Frank 456411.

7   Q.  When you say "Frank," it's just the letter F, correct?

8   A.  That's all.

9   Q.  Now, this voucher was filled out by you, correct?

10  A.  That is correct.

11  Q.  What does it reflect that you recovered from the apartment

12  that you testified about earlier?

13  A.  Item 1, quantity three, clear plastic bags of alleged

14  cocaine, recovered from 502 West 149th Street.

15  Q.  Is there an apartment number?

16  A.  Yes, there is.  3A7.

17  Q.  Now, you say quantity three.  What does that mean?

18  A.  Three clear plastic bags.

19  Q.  Of alleged cocaine?

20  A.  That is correct.

21  Q.  What is item 2?

22  A.  Item 2 is one clear plastic bag of alleged cocaine.

23  Q.  At the bottom, does it indicate where these two items were

24  recovered?

25  A.  Yes, it does.

J3C8ACO4                          McAllister - Direct

1    Q.   Where does it say item 1 was recovered?

2    A.   Item 1 was recovered in a floor trap in the weight room of

3    apartment 3A7.  And item 2 was recovered from a wall outlet

4    trap in the living room area of the same location.

5    Q.   Now, for item 1 that was found in the floor trap, can you

6    explain to the jury what a floor trap is?

7    A.   It's a concealed area, it's usually a floor tile that is

8    down on the ground.  It could be a floor tile, it could be

9    wooden planks, into the ground.  You would never notice that it

10   was out of the ordinary.  And there is a device that you would

11   hit to either release electrical current or a magnetic current,

12   and this would pop up and you would be able to pop it off like

13   a hatch.

14   Q.   In your training and experience, what would be inside

15   something like that?

16   A.   It could be anything from guns, money, drugs, to drug

17   records.

18   Q.   Now, in this case, item 1, the three clear plastic bags of

19   cocaine, those were recovered from that floor trap, correct?

20   A.   That is correct.

21   Q.   Item 2, you testified, was recovered from a wall outlet

22   trap.  Can you explain to the jury what a wall outlet trap is?

23   A.   It was a wall outlet that was not operating; you would be

24   able to slide it out and put whatever, like I said, jewelry,

25   drugs, money.  But it was -- looks like a wall outlet that you

1    would plug a TV or lamp into it.

2    Q.   When you pulled out that wall outlet, what was inside that

3    wall outlet?

4    A.   A clear plastic bag of alleged cocaine.

5    Q.   Moving now to the same set of vouchers but page 2, 3525-03,

6    page 2.

7          Do you have that voucher in front of you?  I think

8    it's also on your screen, Mr. McAllister, if that's easier for

9    you.

10   A.   OK.  Yes.

11   Q.   Is this also a voucher that you completed?

12   A.   Yes, it is.

13   Q.   This is for items that you seized?

14   A.   That's correct.

15   Q.   What is reflected in this voucher?

16   A.   U.S. currency, $6,000 worth of U.S. currency, recovered

17   from the floor trap in the weight room of 502 West 149th

18   Street, apartment 3A7.

19   Q.   Is it fair to say that this currency was recovered from the

20   same floor trap as the three clear plastic bags of cocaine?

21   A.   That is correct.

22   Q.   How much currency was recovered?

23   A.   $6,000.

24   Q.   Is it broken down by different denominations in this

25   voucher?

1   A.  Yes, it is.

2   Q.  What kind of denominations are reflected?

3   A.  OK.  Item 1.  Three $100 bills, U.S. currency.

4           Item 2.  19 $50 bills, U.S. currency.

5           Item 3.  200 $20 bills, U.S. currency.

6           Item 4.  71 $10 bills in U.S. currency.

7           Item 5.  Five $5 bills U.S. currency.

8           Item 6.  15 $5 bills in U.S. currency.

9   Q.  Moving now to the same set of vouchers 3525-03, page 3.

10          Do you have that in front of you?

11  A.  I do.

12  Q.  What is reflected in that voucher that you recovered?

13  A.  That voucher would be F56413.

14          Item 1 was notepads and miscellaneous papers with

15  drugs records.

16          Item 2 was one Ohaus triple beam scale.

17          Item 3 was a Motorola cell phone with a battery and

18  adapter.

19          Item 4 was one linear trap opener.

20  Q.  You testified there's four items.  Where were the first two

21  items, items 1 and 2, where were they recovered?

22  A.  They were recovered in the floor trap in the weight room.

23  Q.  That's the same floor trap you previously testified to,

24  correct?

25  A.  That is correct.

1   Q.  What about item 3, the Motorola cell phone, and item 4, the
2   linear trap opener, where were those?
3   A.  Item 3 was recovered in the kitchen drawer, and item 4 was
4   recovered under the refrigerator in the kitchen.
5   Q.  Now, I am going to ask you about a couple of items.
6          Item 2, you mentioned an Ohaus triple beam scale.
7   What is that?
8   A.  That's a scale -- normally during our search warrants, we
9   would find that drug dealers would use it to weigh quantities
10  of drugs.
11  Q.  Is it fair to say you have done hundreds of search warrants
12  and hundreds of arrests in your career?
13  A.  Yes, it is.
14  Q.  Is that a common item you would find?
15  A.  Yes, it is very normal to find in an apartment like that.
16  Q.  Item number 4 is a linear trap opener.  Can you explain to
17  the jury what that is?
18  A.  It's just -- the best way to describe it is a garage door
19  opener.  You point it to the floor and it will release that
20  trap, the trap will pop open.  It could activate any trap.  It
21  could be a ceiling trap, but in this case it was a floor trap.
22  You point it to the floor and the floor would pop up.
23  Q.  This opener, is it fair to say, opened the trap that had
24  the drugs and the money in it?
25  A.  That is correct.

1    Q.  Moving now to the voucher which is marked 3525-03, page 4.

2            Do you have that document in front of you?

3    A.  Yes, I do.

4    Q.  What is the voucher number?

5    A.  It is F456415.

6    Q.  This was a voucher that you also filled out, correct?

7    A.  That's correct.

8    Q.  What is reflected in this voucher?

9    A.  I will go through it.

10           Item 1.  Two Charco .38 special revolvers.

11   Q.  What is a Charco .38 special revolver?

12   A.  It's a handgun.

13   Q.  And there are two of those?

14   A.  Yes, there is.

15   Q.  What is the difference between a revolver and a pistol?

16   A.  Well, a revolver is a gun that needs to be loaded bullet by

17   bullet in a cylinder, and then you would close the cylinder and

18   you would be able to fire that gun.

19           An automatic, or a 9 millimeter, has what is called a

20   clip, it holds anywhere from six up, and you actually have to

21   push the bullets into the clip.  And once you get them filled,

22   you would slide that clip up into the bottom of the gun and be

23   able to fire as many rounds as you can put in that clip; they

24   all carry different amounts.

25   Q.  What is the difference between a revolver and a pistol with

J3C8ACO4                          McAllister - Direct

1   respect to when the weapon is fired?  What happens to the shell

2   casing?

3   A.   The shell casing stays within the revolver.  And in the 9

4   millimeter, the shell gets expended out of the gun and it drops

5   to the floor or wherever you're standing.

6   Q.   So in a revolver, the shell casing stays in the weapon,

7   correct?

8   A.   That is correct.  It has got to be manually ejected out of

9   the gun.

10  Q.   So item 1 is two of those revolvers.

11          What is item 2?

12  A.   Item 2 is one Beretta, 9 millimeter, model 92FS, with a

13  clip and a case.

14  Q.   That 9 millimeter, that's a pistol, that's different than a

15  revolver, correct?

16  A.   That is correct.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1    BY MR. KROUSE:

2    Q.   What is Item No. 3?

3    A.   Item 3 is two H & K, which is short Heckler & Koch 40

4    caliber Smith & Wesson with clips and cases.

5    Q.   It is two of those?

6    A.   That's correct.

7    Q.   Is that a pistol or a revolver, the Heckler & Koch 40

8    caliber?

9    A.   That's a -- almost -- it's the same as the 9-millimeter.

10   It is -- it uses a clip.  It is not a revolver.

11   Q.   So there are two of those?

12   A.   That is correct.

13   Q.   What is Item No. 4?

14   A.   Item 4 is a 50 9-millimeter Luger rounds in a box.

15   Q.   By "rounds," what does that refer to?

16   A.   That would be bullets that you would need to use to load

17   the 9-millimeter handguns or 40 caliber handgun.

18   Q.   Is 9-millimeter a type of caliber?

19   A.   That's correct.

20   Q.   What is Item No. 5?

21   A.   One empty Beretta box with a clip.

22   Q.   What is a clip?

23   A.   A clip is an ammo clip that holds the bullets that you

24   slide into the bottom of the gun so it can fire rounds.

25   Q.   What is Item No. 6?

J3C6ACO5                              McAllister - direct

1   A.   Item 6 is a black crossbow with an arrow.

2   Q.   What is a crossbow?

3   A.   It's a -- it's like -- almost like a pistol with a string

4   on it and you pull back and you load an arrow into it or what

5   you call a dart.  And when you release the trigger, the arrow

6   should go forward.

7   Q.   So it is a type of weapon with an arrow; is that accurate?

8   A.   Pretty much.

9   Q.   What is Item No. 7?

10  A.   Item 7 quantity 10 40 caliber rounds.

11  Q.   Rounds here refers to bullets; correct?

12  A.   That is correct.

13  Q.   That is 10 in that item; correct?

14  A.   That is correct.

15  Q.   Where were all of these weapons and bullets recovered from

16  in that apartment?

17  A.   They where are recovered in the floor trap in the weight

18  room at 502 West 149 Street, Apartment 3A7.

19  Q.   The same place with the cocaine and the currency; correct?

20  A.   That is correct.

21  Q.   Moving to page 5 of the vouchers, 3525-03, page 5.

22       What is the voucher number of this document?

23  A.   F456418.

24  Q.   What is it -- does this document reflect was seized by you?

25  A.   It was the crossbow and dart.  It appeared to be -- it was

1    on the 5th -- May 5th of 1994 taken from the other voucher and

2    put in a separate voucher.

3    Q.   Does it say on this voucher that it was previously

4    vouchered?

5    A.   Yes, it does.

6    Q.   Why was the crossbow and the dart in particular moved to

7    its own separate voucher?

8    A.   Because the crossbow and dart would not be going to the

9    ballistic unit to be tested because it is not fired by

10   gunpowder or it doesn't leave any markings on an arrow.  So it

11   had to be sent separately -- vouchered separately.

12   Q.   And then the other items, firearms and bullets, those were

13   all sent where?

14   A.   To the firearms unit -- ballistic unit to be tested.

15   Q.   After this search warrant was executed was a picture taken

16   with you and the members of the team and the evidence that was

17   recovered?

18   A.   Yes, there was.

19            MR. KROUSE:  Ms. Fetman, can you put on the screen for

20   everyone Government Exhibit 800.

21   Q.   Do you recognize this photograph?

22   A.   Yes, I do.

23   Q.   What is it?

24   A.   It's a photo of the team that worked at Manhattan

25   narcotics.

J3C6ACO5                          McAllister - direct

1   Q.  Are you in the photograph?

2   A.  Yes, I am.

3   Q.  Where are you?

4   A.  Top row far right.

5   Q.  Wearing the chain?

6   A.  That's me.

7   Q.  What is depicted on the table in front of all these

8   individuals?

9   A.  The seizure that day after all the search warrants were

10  completed.

11  Q.  You testified about the seizure of several guns, cash,

12  cocaine.

13          Is that all reflected in this photograph?

14  A.  Yes, it is.

15  Q.  You testified about the seizure of the triple beam Ohaus

16  scale?

17  A.  Yes.

18  Q.  Is that reflected on the table?

19  A.  There is one there on the table, yes.

20  Q.  Where is it?

21  A.  Bottom right.

22  Q.  It may be difficult to see, but do you see a crossbow here?

23  A.  Yes.  It's in front of -- almost in front of Detective

24  Callahan.  You can see the string.  It is just to the left of

25  the last Ohaus triple beam scale.

J3C6ACO5                      McAllister – cross – Mr. Miedel

1    Q.  The black item?

2    A.  That's it there, yes.

3    Q.  The one that has the red circle around it?

4    A.  That's correct.

5    Q.  That is the crossbow that you seized and put into evidence;

6    correct?

7    A.  That is correct.

8            MR. KROUSE:  No further questions.

9            THE COURT:  All right.  Any cross-examination?

10           MR. KOFFSKY:  Nothing from Mr. Acosta, your Honor.

11           THE COURT:  Mr. Diaz?

12           MR. MIEDEL:  Yes.

13   CROSS-EXAMINATION

14   BY MR. MIEDEL:

15   Q.  Hello, sir.

16   A.  How are you?

17   Q.  Are you aware of the names of any of the subjects that

18   were -- any of the names of the people that were subjects of

19   this search warrant?

20   A.  No.

21           MR. MIEDEL:  Nothing further.

22           THE COURT:  Any redirect?

23           MR. KROUSE:  No, your Honor.  Thank you.

24           THE COURT:  Okay.  You may step down.  Thank you.

25           THE WITNESS:  Thank you, your Honor.

J3C6ACO5                           McAllister – cross – Mr. Miedel

1          (Witness excused)

2          THE COURT:  Call your next witness.

3          MR. KROUSE:  Your Honor, the government would like to

4    read two stipulations between the parties.

5          THE COURT:  Are these testimonial or as to facts?

6          MR. KROUSE:  Testimonial, your Honor.

7          THE COURT:  Ladies and gentlemen, a stipulation as to

8    testimony is an agreement by the parties that if called as a

9    witness, the witness would testify in a certain manner or would

10   say thus and so in their testimony.  You are required to accept

11   that if called the witness would so testify.  The weight and

12   significance that you give to the testimony is entirely up to

13   you to decide.  Stipulations save the time of the parties, the

14   Court, the jury in presenting live witnesses.

15         You may proceed.

16         MR. KROUSE:  Thank you, your Honor.

17         It is hereby stipulated between the parties that if

18   called to testify as a witness, Lieutenant Michael Zanelone of

19   the New York City Police Department NYPD Property Clerk

20   Division would testify that he has direct knowledge of NYPD's

21   property retention policies and practices and that:

22         1.  The property listed on NYPD Property Clerk's

23   Invoice F456366, consisting of $155 in United States currency

24   recovered by NYPD Police Officer Santos Rivera from James E.

25   Warren after his arrest in the vicinity of West 149th Street

J3C6ACO5                    McAllister - cross - Mr. Miedel

and Amsterdam Avenue, New York, New York, on or about

April 29th, 1994, was deposited into an account in the name of

the NYPD Pension Fund consistent with NYPD policy on or about

August 7th, 1996.

        2.  Property listed on NYPD property clerk's invoice

F456408, consisting of $9,950 in United States currency

recovered by NYPD Police Officer Michael Callahan during the

execution of search warrants at 500 West 149th Street, New

York, New York, on or about May 4th, 1994, was deposited in an

account in the name of the NYPD Pension Fund pursuant to NYPD

policy on or about March 4th, 1997.

        3.  Property listed on NYPD Property Clerk's Invoice

F456412, consisting $6,000 in United States currency recovered

by NYPD Police Officer Patrick McAllister during the execution

of the search warrant on or about May 4th, 1994, was deposited

in an account in the name of the NYPD Pension Fund pursuant to

NYPD policy on or about April 15th, 1996.

        Property listed on NYPD property -- sorry.

        4.  Property listed on NYPD Property Clerk's Invoice

F456413 consisting of: (1) notepads miscellaneous papers with

drug records; (2) an Ohaus triple beam scale; (3) a Motorola

cell phone with a battery and adaptor; and (4) a linear trap

opener, recovered by NYPD Police Officer Patrick McAllister

during the execution of a search warrant on or about May 4th,

1994, was destroyed pursuant to the NYPD policy on or about

J3C6ACO5                          McAllister - cross - Mr. Miedel

June 30th, 1995.

5.   Property listed on NYPD Property Clerk's Invoice
F456415 consisting of:  (1) two Charco 38 caliber special
revolvers, Serial Nos. 1115065 and 115220; (2) one Beretta
9-millimeter revolver, Model 92FS, Serial No. BER307174Z with a
clip and a case; (3) two 40 caliber Smith & Wesson guns with
clip and cases, Serial Nos. 22-1085 and 22-10187; (4)
59-millimeter Luger bullets in a box; (5) one empty Beretta box
with a clip; (6) one black crossbow with an arrow; and (7) 10
40 caliber bullets recovered by NYPD Police Officer Patrick
McAllister during the execution of a search warrant on or about
May 4th, 1994, was destroyed pursuant to NYPD policy on or
about May 23, 2002.

6.   Property listed on NYPD Property Clerk's Office
F45641, consisting of (1) crossbow; and (2) one dart, recovered
by NYPD Police Officer Patrick McAllister during the execution
of a search warrant on or about May 4th, 1994, was destroyed
pursuant to NYPD policy on or about March 1, 1996.

The government offers Government Exhibit 1000-S.

THE COURT:  Any objection?

MR. WEINSTEIN:  No.

MS. MARCUS:  No objection.

THE COURT:  Is that in fact the stipulation between
the parties?

MR. WEINSTEIN:  Yes.

1          MS. MARCUS:  Yes.

2          THE COURT:  Thank you.

3          (Government's Exhibit 1000-S received in evidence)

4          MR. KROUSE:  One more stipulation, your Honor.

5          The parties hereby stipulate if called to testify as a

6     witness, Evidence Property Control Specialist Samuel Williams

7     of the New York Police Department ("NYPD") Property Clerk

8     Division, would testify that Detective Carlos Vasquez of the

9     NYPD requested him to conduct a diligent search for the

10    following property which he was unable to locate:

11         (1) Property listed on NYPD Property Clerk's Invoice

12    F456417 consisting of one white Motorola beeper, Serial No.

13    0049863 bearing the initials "SR"; and (2) a black E5

14    communications beeper, Serial No. NYSE0184436WV, bearing the

15    initials "SR" recovered by NYPD Police Officer Santos Rivera

16    after the arrest of Robert A. Mojico Isaac, a/k/a Robert

17    Acosta, on or about May 4th, 1994.

18         2.  If called to testify as a witness, Evidence

19    Property Control Specialist Charmian Carryl of the NYPD

20    Property Clerk Division would testify that the Detective Carlos

21    Vasquez of the NYPD requested her to conduct a diligent search

22    for the following property which he was unable to locate:

23         (A)  Property listed on NYPD Property Clerk's Invoice

24    F45 --

25         THE COURT:  Slower.

1            MR. KROUSE:  Yes, your Honor.

2            F456367, consisting of:  (1) two clear plastic bags

3    containing alleged crack cocaine or powder cocaine bearing the

4    initials "SR"; and (2) two brown paper backs bearing the

5    initials "SR" recovered everyday by NYPD Police Officer Santos

6    Rivera in the vicinity of West 149th Street Amsterdam Avenue,

7    New York, New York, on or about April 29th, 1994; and

8            (B)  Property listed on NYPD Property Clerk's Invoice

9    F456405, consisting of:  (1) Luger Model 10/22 carbine 22

10   caliber gun, bearing the initials "JG"; (2) a Ram Line

11   ammunition clip bearing the initials "JG";  (3) 48 rounds of a

12   22 caliber ammunition; (4) four rounds of 30 carbine

13   ammunition; and (5) one round of 9-millimeter ammunition

14   recovered by NYPD Police Officer John Galasso from 500 West

15   149th Street, Apartment 2 E, New York, New York, on or about

16   May 4th, 1994.

17           (C)  Property listed on NYPD Property Clerk's Invoice

18   F456411, consisting of an unspecified quantity of alleged

19   cocaine recovered by NYPD Police Officer Patrick McAllister

20   during the execution of a search warrant on or about May 4th,

21   1994.

22           The government offers Government Exhibit 1001-S.

23           THE COURT:  Any objection?

24           MR. WEINSTEIN:  No.

25           THE COURT:  Is that in fact the stipulation of the

J3C6ACO5                          Stephenson - direct

1    parties?

2              MR. WEINSTEIN:  Yes.

3              MS. MARCUS:  Yes.

4              THE COURT:  Received.

5              (Government's Exhibit 1001-S received in evidence)

6              MR. KROUSE:  Your Honor, the government calls Ronald

7    Stephenson.

8              THE DEPUTY CLERK:  Raise your right hand.

9     RONALD STEPHENSON,

10         called as a witness by the Government,

11         having been duly sworn, testified as follows:

12             THE DEPUTY CLERK:  State your name and spell and spell

13   it for the record.

14             THE WITNESS:  My name is Ronald Stephenson.

15   R-o-n-a-l-d.  S-t-e-p-h-e-n-s-o-n.

16             THE COURT:  You may inquire.

17   DIRECT EXAMINATION

18   BY MR. CHIUCHIOLO:

19   Q.  Good afternoon, Mr. Stephenson.

20   A.  Good afternoon.

21   Q.  Are you currently employed?

22   A.  Yes, part-time.

23   Q.  What do you do?

24   A.  Martial arts instructor presently.

25   Q.  Did you ever work for the New York City Police Department?

J3C6ACO5                          Stephenson - direct

1    A.  Yes.

2    Q.  What years did you work for the NYPD?

3    A.  1984 to 2004.

4    Q.  Did you retire from the NYPD in 2004?

5    A.  Yes, I did.

6    Q.  What was your title upon retiring from the NYPD?

7    A.  Sergeant.

8    Q.  I would like to focus you on September of 1994.

9            At that time what unit within the NYPD were you

10   assigned to?

11   A.  I was assigned to Manhattan south strategic narcotics and

12   guns unit.

13   Q.  How long were you with the narcotics and guns unit?

14   A.  Approximately five years.

15   Q.  In September of '94 were you involved in an investigation

16   of a drug organization located in the vicinity of 149th Street

17   and Amsterdam Avenue?

18   A.  Yes, I was.

19   Q.  Were you working with other members of the NYPD as a team

20   on that investigation?

21   A.  Yes, I was.

22   Q.  I want to focus you on the date of September 22nd, 1994.

23            Were you working on that date as part of this

24   investigation?

25   A.  Yes, I was.

J3C6ACO5                          Stephenson – direct

1   Q.  With the understanding that this was a long time ago, do

2   you remember some of the details of what happened on that day?

3   A.  Yes, I do.  I remember some of the details.

4   Q.  Do you remember all of the details of what happened that

5   day?

6   A.  No.  Not all the details.

7   Q.  What were you doing on September 22nd, 1994, regarding the

8   investigation of the drug organization in the vicinity of 149th

9   Street and Amsterdam Avenue?

10  A.  I was executing a search warrant.

11  Q.  Do you remember where you were executing the search

12  warrant?

13  A.  500 West 149th Street.  Apartment 3D, as in David.

14  Q.  Were you alone or were you with someone else that day?

15  A.  I was with my field team and I was with one of my partners.

16  Q.  Mr. Stephenson, what was your role in the execution of the

17  search warrant?

18  A.  I was the arresting officer and I was also the walk-on

19  officer with my partner.

20  Q.  What was the first thing you did that day as part of your

21  execution of the search warrant when you got to the building?

22  A.  Excuse me?

23  Q.  When you got to the building that day, what was your role

24  in executing the search warrant?

25  A.  Our role was to sit outside Apartment 3D to see if anyone

J3C6ACO5                          Stephenson - direct

1    is going to run out.

2    Q.  What did you hear when you got to the front door of the

3    Apartment 3D?

4    A.  I heard a buzzer go off and inside people I heard people

5    yelling, "Police here.  Police here."

6    Q.  What after you heard the buzzing noise and the yelling

7    inside or the noise inside the Apartment 3D?

8    A.  Gentleman came running out right to us.

9    Q.  What happened to the person who ran out of the apartment?

10   A.  We placed him under arrest.

11   Q.  So I am going to ask you questions about the arrest later,

12   but first I would like to to ask you some questions about what

13   you observed inside the Apartment 3D.

14          Did you eventually enter the apartment to execute the

15   search warrant?

16   A.  Yes, I did.

17   Q.  What did you observe when you entered the apartment?

18   A.  I don't quite totally recall everything.

19   Q.  Well, do you recall once you were inside the apartment, did

20   you seize any property inside the apartment?

21   A.  Yes, we did.

22   Q.  Do you recall every item that you seized that day?

23   A.  Not every item, no.

24   Q.  Is there something that would help refresh your

25   recollection as to the property you seized from inside the

1  apartment that day?

2  A.  Yes.

3  Q.  What would help refresh your recollection?

4  A.  Property vouchers.

5  Q.  I am going to hand you a stack of documents which were

6  premarked for identification purposes as 3531-09.  I am going

7  to hand you 11 of 22.

8       THE COURT:  I am going to explain to you what it means

9  to refresh your recollection.  You look at the document and it

10  looks authentic to you and there are two possibilities.  You

11  read it and it doesn't refresh your recollection.  It looks

12  like it is probably a good looking document to you or something

13  you've seen before or maybe even something that you signed, but

14  it doesn't refresh your recollection.

15       If it refreshes your recollection, you should be able

16  to turn it over face down and testify from memory.  Because now

17  it jogged your recollection.  Maybe it was the date of your

18  nephew's birthday.  Maybe it is something unusual there.  That

19  is a what a refreshed recollection is.

20       So the question now is you are supposed to look at

21  this and the first question is whether it refreshes your

22  recollection on the question that you were asked about.  And if

23  it does, you will say yes.  And if it doesn't, you will say no

24  and we'll take it from there.

25       Okay?

1           THE WITNESS:  Okay.

2    Q.  I am going to ask you to review those documents and put

3    them aside once you are done.

4    A.  Okay.

5    Q.  You can put those documents aside.

6           Mr. Stephenson, having reviewed those documents, does

7    it refresh your recollection as to what you seized while

8    executing the search warrant on September 22nd, 1994, or do you

9    need to read the items listed on the vouchers in order to

10   convey the information accurately to the jury?

11   A.  I would have to read the items to convey them accurately.

12   Q.  Are those your property vouchers?

13   A.  Yes.  They have my signature on it.

14   Q.  Did you sign each of those property vouchers?

15   A.  Yes.

16   Q.  Let me ask you a few questions.  Can you please tell the

17   jury what is in evidence property voucher and why you prepared

18   them?

19   A.  Evidence property vouchering contain evidence for a case.

20   It is also to prepare for safekeeping and chain of custody.

21   Q.  Approximately how many property vouchers did you fill out

22   during your years at the NYPD?

23   A.  Approximately maybe a thousand.

24   Q.  Do you believe that you prepared the property vouchers in

25   front of you close in time when the search warrant was

J3C6ACO5                        Stephenson - direct

1    executed?

2    A.  Yes.

3    Q.  During your career with the NYPD, was it important that you

4    prepared your vouchers accurately?

5    A.  Yes.

6    Q.  Was it your practice to be accurate when filling out NYPD

7    property vouchers?

8    A.  Yes.

9    Q.  Do you believe you filled out those vouchers accurately?

10   A.  Yes, I believe so.

11          MR. CHIUCHIOLO:  Your Honor, the government requests

12   that Mr. Stephenson can read from his vouchers as his past

13   recollection recorded.

14          MR. KOFFSKY:  No objection.

15          THE COURT:  Proceed.

16   BY MR. CHIUCHIOLO:

17   Q.  So, Mr. Stephenson, if you could pull up in front of you

18   Voucher F645427, which is 522.  I am going to hand you what has

19   been premarked for identification purposes as Government

20   Exhibit 812.

21          Mr. Stephenson, focusing on what has been marked for

22   identification as Government Exhibit 812, do you recognize it?

23   A.  Yes.

24   Q.  Does the number on the bag that contains Government Exhibit

25   812 match the property voucher that is in page 5 of 3531-09?

J3C6ACO5                              Stephenson - direct

1    A.  Yes, it does.

2    Q.  Is your signature on this property voucher?

3    A.  Yes.  That's my signature on the voucher, yes.

4    Q.  Does the description of the property listed on that voucher

5    appear to be the description of what is marked as Government

6    Exhibit 812?

7    A.  Yes.  It's a notebook, yes.

8              MR. CHIUCHIOLO:  Government offers Government

9    Exhibit 812.

10             THE COURT:  Any objection?

11             MR. KOFFSKY:  No objection.

12             THE COURT:  It is received.

13             (Government's Exhibit 812 received in evidence)

14   BY MR. CHIUCHIOLO:

15   Q.  Can you take the item, Mr. Stephenson, that is now received

16   in evidence, Government Exhibit 812, out of the bag?

17             THE COURT:  Ladies and gentlemen, I am going to hold

18   you in suspense.  You will have to come back tomorrow to see

19   what is in bag.  So I feel like I have known you for months,

20   maybe years, but it has only been a day, two days.  This is the

21   second day.  So I appreciate the smiles.  I appreciate your

22   remaining in good spirits.  Please go home and relax.  Put the

23   case out of your mind.  Remember, do not discuss the case among

24   yourselves or with anyone, including family and friends.  You

25   don't do any text willing or blogging and you don't do any

J3C6ACO5                        Stephenson – direct

1    research on your own.

2                We'll be back in action for a 10:00 start.  In order

3    to be back in action for a 10:00 start, you really need to be

4    in the jury room 10 to 10:00.  Thank you very much and I will

5    see you tomorrow morning.

6                (Jury excused)

7                (In open court; jury not present)

8                THE COURT:  See you all tomorrow morning.

9                Have a pleasant evening.

10                (Adjourned to March 13, 2019, at 10:00 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                            Page

 3   MICHAEL CALLAHAN

 4   Direct By Ms. Korenbaum  . . . . . . . . . . .86

 5   Cross By Mr. Koffsky . . . . . . . . . . . . 100

 6   Cross By Ms. Marcus  . . . . . . . . . . . . 108

 7   SANTOS RIVERA

 8   Direct By Mr. Krouse . . . . . . . . . . . . 110

 9   Cross By Mr. Koffsky . . . . . . . . . . . . 128

10   Cross By Mr. Miedel  . . . . . . . . . . . . 131

11   Redirect By Mr. Krouse . . . . . . . .132 KROUPS

12   JOHN GALASSO

13   Direct By Ms. Korenbaum  . . . . . . . . . . 133

14   Cross By Mr. Koffsky . . . . . . . . . . . . 145

15   Cross By Ms. Marcus  . . . . . . . . . . . . 147

16   PATRICK McALLISTER

17   Direct By Mr. Krouse . . . . . . . . . . . . 148

18   Cross By Mr. Miedel  . . . . . . . . . . . . 165

19   RONALD STEPHENSON

20   Direct By Mr. Chiuchiolo . . . . . . . . . . 171

21                    GOVERNMENT EXHIBITS

22   Exhibit No.                            Received

23    1  . . . . . . . . . . . . . . . . . . . .89

24    701  . . . . . . . . . . . . . . . . . . .98

25    800  . . . . . . . . . . . . . . . . . . .99
```

```
 1   801     . . . . . . . . . . . . . . . . . 124

 2   802A, 802B and 803C   . . . . . . . . . . . 141

 3   1000-S    . . . . . . . . . . . . . . . . 169

 4   1001-S    . . . . . . . . . . . . . . . . 171

 5   812     . . . . . . . . . . . . . . . . . 178
```